COMMONWEALTH vs. SUSAN M. CLARY.

Worcester.  November 3, 1982. — March 29, 1983.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, LYNCH, & O'CONNOR, JJ.

*Assault and Battery.  Practice, Criminal,* Required finding, Argument by
prosecutor.  *Evidence,* Hearsay, Spontaneous utterance.

At the trial of an indictment for assault and battery by means of a danger-
ous weapon the Commonwealth presented sufficient evidence to
enable the jury to conclude beyond a reasonable doubt that the de-
fendant had stabbed the victim with a knife, and inconsistencies in the
testimony relating to identification, although posing questions for the
jury, did not render this testimony insufficient.  [588-589]

The judge at a trial for assault and battery by means of a dangerous
weapon did not abuse his discretion by concluding that the probative
value of a spontaneous utterance by the victim identifying his attackers
but referring to them as lesbians outweighed its possible prejudicial ef-
fect, and in admitting the statement in evidence under an exception to
the hearsay rule.  [589]

Where the prosecutor at a criminal trial, at which proof of the defend-
ant's guilt was not overwhelming, referred during closing argument to
matters not in evidence, in urging the jury to discount serious dis-
crepancies in the Commonwealth's identification testimony; hypothe-
sized an unproved lesbian relationship between the defendant and a
female companion as motive for her attack on the victim; and mis-
stated evidence and argued unfound inferences respecting a certain
knife, the cumulative effect of the three lines of closing argument was
so prejudicial to the defendant as to present a substantial risk of a mis-
carriage of justice, and thus necessitate reversal of her conviction of
assault and battery by means of a dangerous weapon.  [589-594]

INDICTMENT found and returned in the Superior Court
Department on February 6, 1980.

The case was tried before *McCooey,* J., a District Court
judge sitting under statutory authority.

After review by the Appeals Court, the Supreme Judicial
Court granted leave to obtain further appellate review.

*Jane Larmon White* for the defendant.

*Lynn Morrill Turcotte,* Assistant District Attorney, for the Commonwealth.

HENNESSEY, C.J. The defendant, Susan M. Clary, was found guilty by a jury of assault and battery with a dangerous weapon. The trial judge put her on probation for two years. The defendant then appealed to the Appeals Court, asserting error in the trial judge's (1) denying her motion for a required finding of not guilty; (2) denying her defense counsel's motion to withdraw from representation in order for counsel to testify; (3) permitting introduction of an allegedly inflammatory and immaterial statement by the victim; and (4) allowing certain allegedly irrelevant, inflammatory, and nonevidentiary remarks made by the prosecutor to the jury in his closing argument. The Appeals Court affirmed the conviction in *Commonwealth* v. *Clary,* 13 Mass. App. Ct. 1034 (1982). We granted the defendant's application for further appellate review. We reverse and remand for a new trial.

We agree with the Appeals Court that the trial judge did not err in denying the defendant's motion for a required finding of not guilty, or in admitting in evidence the allegedly inflammatory statement by the victim. We determine, however, that certain impermissible comments made by the prosecutor in his closing argument were so prejudicial as to require reversal of the judgment. We need not and do not reach the issue of the judge's refusal to allow trial counsel to withdraw in order to testify.

The following facts are uncontroverted. The victim, David J. Spillane, arrived at a bar in Worcester at approximately 1 A.M., on November 4, 1979. Spillane testified that prior to arriving at the bar that evening he consumed four beers, smoked two marihuana cigarettes, ingested a valium tablet, and snorted a white powder which he thought was cocaine, but which he later learned was mannitol, a substance used to "cut" cocaine. Denise Przygoda and Clary came into the bar. Przygoda, who was the sister of Spillane's girl friend of five years, told Spillane she wanted to

speak with him outside. Przygoda, Clary, and Spillane then went outside, whereupon Przygoda asked Spillane what right he had to hit her sister. Przygoda then punched him repeatedly in the face with her closed fist. During this time Przygoda, who was nearly as tall as Spillane, stood directly in front of him, two inches away. Clary was standing next to Przygoda, to the right of Spillane.

There was conflicting testimony from several witnesses concerning what events occurred after Przygoda began hitting Spillane in the face. Spillane testified that, as he was leaning against a car with his back to the street, he placed his hand on Przygoda's head and held her by the hair, and then he saw a knife in Clary's right hand. He further testified that before he had a chance to lower his arms he was stabbed in the chest just above his heart. He threw off his coat and shirt, and one Patty Dyer put pressure on the wound in an attempt to stop the bleeding. He then called to Francis Davieau, manager of the bar, "Franny, those two 'lesies' stabbed me," and pointed to the defendant, stating, "She's the one, don't let her get away." Spillane, accompanied by Dyer, was transported to City Hospital in a police cruiser driven by Officer Paul Maki. Spillane testified that he told the officer Susan Clary had stabbed him.

Davieau testified that he arrived at the bar about 10 P.M., and drank eight to ten mixed drinks while checking identifications at the door. After speaking to police outside the bar about an unrelated incident, Davieau walked around the side of the building where he saw Clary, Przygoda, and Spillane involved in a scuffle. Davieau testified that Spillane said to him, "Franny, she stabbed me.". Davieau then went over to Spillane and applied pressure to his wound and told someone to summon the police who were just around the corner. Davieau testified that he asked Clary what had happened and that she said, "I stabbed him." Davieau then grabbed her and held her until the police arrived about five minutes later.

On cross-examination, Davieau testified that Clary's hair was a lighter blonde and shorter on the night of the incident

than it was at trial. He further stated that he was certain that Clary wore bibbed overalls and a shirt or blouse. He also testified that Przygoda, the woman with Clary, was approximately six inches shorter than Clary and had long, dark brown hair. Davieau admitted, however, that during an interview with defense counsel a few weeks prior to the trial, he told defense counsel that he thought it was the shorter woman, not Clary, who said she had stabbed Spillane. He accused defense counsel of "pump[ing] [that description] into [his] head."

Paul Gully, an occasional employee of the bar, was not working on the night of the incident but was at the bar drinking beer with friends from 9 P.M. to about 1 A.M. He went outside about 1 A.M., after being informed that "there was trouble out there." He testified that he saw Davieau holding Clary and that he heard Clary say, "I did it, so what?" On cross-examination, Gully described Przygoda as being shorter and as having longer and darker-colored hair than the defendant. He further testified that the woman whom Davieau held wore coveralls with a bib and straps, and perhaps a plaid wool shirt. He admitted that later in the morning of November 4, 1979, he went to the police station and gave a statement that a police officer typed, in which he stated that the woman who said "I did it, so what?" was five feet, two inches tall, of chubby build, and with long, dark hair.

Patricia Dyer, who had spoken with Spillane several times at the bar prior to the night of the incident, was at the bar about 1 A.M. on November 4, 1979. She went outside when the band stopped playing, and observed Spillane talking to Przygoda and Clary, and a man whom she did not know. Dyer described Przygoda as heavyset, about five feet, four inches tall, with long, dark brown hair, and described Clary as having blonde hair and being taller than Przygoda. Dyer testified that she saw Clary stab Spillane. She further testified that she accompanied Spillane to the hospital in the police cruiser and that during this ride Spillane said that Susan Clary had stabbed him.

On cross-examination, Dyer stated that she was later transported by Officer Roland Almstrom from the hospital to the police station where she viewed Przygoda and Clary. Dyer testified at first that she had not identified either girl as the one who did the stabbing but later stated that she had told police that Clary had stabbed Spillane. She acknowledged that she had later made a statement, which Almstrom had typed out for her, and that she had signed it. She admitted that in the statement she had said that the girl who stabbed Spillane was a white girl, about twenty-five years old, approximately five feet, two inches or five feet, four inches tall, chubby, with brown, waist-length straight hair, who was wearing a rust-colored sweater, unbuttoned and open in the front. The statement also provided that Dyer had said that the girl who stabbed Spillane "looked a lot like a girl I looked at at the police station named Denise Prozgoda [*sic*]." Dyer denied, however, naming Przygoda and stated that the police put her name in the statement.

Officer Paul Maki testified that he transported Spillane and a young woman in his cruiser from the bar to the hospital. Maki testified that during the ride Spillane told him that Susan Clary was the one who stabbed him. On cross-examination, defense counsel introduced in evidence Maki's police report, written within an hour after the event, which identified Spillane's assailant not as Susan Clary but as a "white female."

Detective John Brabbs testified that Gully, whom he had interviewed, described the woman who stabbed Spillane as being of chubby build, five feet, two inches in height, with dark hair. Officer Almstrom testified that upon seeing the two girls at the police station Dyer said that neither of the two girls had stabbed Spillane. He further testified that Clary was wearing a blue jogging suit on the night of the incident. Almstrom stated that at approximately 4 A.M. on November 4, 1979, he returned to the bar with Clary and Przygoda to bring them back to their car, and he saw a knife under the front seat of a Thunderbird automobile parked in front of the bar. He stated that he did not know to whom

the car belonged. On cross-examination Almstrom testified that Clary's brother was also a police officer. He admitted that he had put in his report that no weapons were found.

Clary testified that she, Przygoda, and Spillane were outside the bar, and Przygoda slapped Spillane three or four times while telling him that she would not allow Spillane to slap her sister around. He yelled at Przygoda to stop and attempted to back away until he was leaning up against Davieau's car. Clary stated that she put her right hand on Przygoda's shoulder and her left hand on Spillane in an attempt to break up the scuffle. Przygoda punched Spillane, and Spillane responded by punching Przygoda squarely on the nose; Przygoda dropped to a squatting position and Spillane began pulling Przygoda's hair. Clary, who was directly behind Przygoda, testified that she grabbed Przygoda's arms from behind. Spillane then jumped away yelling that he had been cut.

Clary testified that she never saw a knife. She also stated that it was Przygoda who said, "I did it, so what?" in response to Davieau's inquiry. Clary stated that she was taken to the police station, where she made a statement, and that Almstrom and her brother later took her back to the bar where she showed them a knife under the front seat of Przygoda's Thunderbird car.

1. The defendant's first contention is that her motion for a required finding of not guilty should have been granted because the evidence identifying her as the assailant could not have convinced any rational trier of fact of her guilt beyond a reasonable doubt. This contention need not long detain us. The essential question in evaluating the denial of a motion for a required finding of not guilty is whether the evidence received, viewed in a light most favorable to the Commonwealth, is sufficient so that the jury "might properly draw inferences, not too remote in the ordinary course of events, or forbidden by any rule of law, and conclude upon all the established circumstances and warranted inferences that the guilt of the defendant was proved beyond a reasonable doubt." *Commonwealth* v. *Vellucci*, 284 Mass.

443, 445 (1933). See *Commonwealth* v. *Amado,* 387 Mass.
179, 186 (1982); *Commonwealth* v. *Latimore,* 378 Mass.
671, 677 (1979). In this case, the Commonwealth presented
sufficient evidence to enable a rational juror to conclude
that Clary committed the crime.

Defense counsel relies upon the inconsistencies in much of
the testimony to support her argument. Inconsistencies in
testimony, however, do not render it insufficient. See
*Commonwealth* v. *Fiore,* 364 Mass. 819, 824 (1974). The
issue of credibility raised by such inconsistencies "is a ques-
tion for the jury to decide; they may accept or reject, in
whole or in part, the testimony presented to them." *Com-
monwealth* v. *Fitzgerald,* 376 Mass. 402, 411 (1978). *Com-
monwealth* v. *Hoffer,* 375 Mass. 369, 377 (1978). *Fiori,
supra* at 824. *Commonwealth* v. *Holiday,* 349 Mass. 126,
129 (1965).

2. The defendant next asserts that the trial judge erred in
allowing in evidence Spillane's statement that "those two
'lesies' stabbed me." We disagree. The statement is admis-
sible under the spontaneous utterance exception to the hear-
say rule as a spontaneous exclamation made during a rapid-
ly developing incident in circumstances reasonably negating
premeditation. See *Commonwealth* v. *Sellon,* 380 Mass.
220, 229-230 & n.14 (1980). Even though the victim's state-
ment contains what Clary now characterizes as prejudicial
language calling Przygoda and the defendant lesbians, the
trial judge did not err in admitting the statement. Whether
evidence "is so prejudicial in nature as to outweigh its pro-
bative value and preclude its admission 'is a question to be
determined by the trial judge in the exercise of his sound
discretion.'" *Commonwealth* v. *Cruz,* 373 Mass. 676, 692
(1977), quoting *Commonwealth* v. *D'Agostino,* 344 Mass.
276, 279, cert. denied, 371 U.S. 852 (1962). See also *Com-
monwealth* v. *Sellon, supra* at 799.

3. Finally, the defendant argues that three separate lines
of persuasion offered by the prosecutor in his closing argu-
ment were so prejudicial as to require reversal of the judg-
ment. The defendant seasonably objected to one of these

arguments, her objection to another was imperfect, and she offered no objection to the third. We examine the arguments cumulatively and, measuring by the "miscarriage of justice" standard, conclude that reversal is required.

First, the defendant challenges the prosecutor's reference to and use of an event reported on a television program. The prosecutor essentially urged the jury to discount the major and serious discrepancies in the identifications of Clary because, as allegedly shown on this television program, bank personnel in California had made similar mistakes in identifying perpetrators of a robbery. The defendant objected on the ground that there was nothing in the evidence of this case with regard to a television program. The judge, however, overruled the objection commenting that the prosecutor's use of the reported event was "just argument." The judge was in error.

In closing argument, counsel may not refer to matters not in evidence. E.g., *Commonwealth* v. *Smith,* 387 Mass. 900, 907 (1983); *Commonwealth* v. *Hoppin,* 387 Mass. 25, 30 (1982); *Commonwealth* v. *Burke,* 373 Mass. 569, 574-577 (1977). The Commonwealth contends, however, that counsel may present an argument by dramatizing it in imaginary dialogue or illustrating it by imaginary occasions. See *Commonwealth* v. *Brownell,* 145 Mass. 319, 323 (1887). See also *Leone* v. *Doran,* 363 Mass. 1, 18 ("It is proper for counsel to use analogy, example and hypothesis as an aid to effective and aggressive argument"), modified on other grounds, 363 Mass. 886 (1973). Although the Commonwealth's general assertion is correct, the prosecutor's statements in this case were not merely "illustrative" nor did he refer to an "imaginary" event. Rather, the prosecutor intended the jury to believe that the report on the television program was true and accurate. Accordingly, it was improper. See *Leone, supra.*

In evaluating the effect of the prosecutor's improper statements, we must determine "whether the argument as a whole is prejudicial in light of all the circumstances, including the nature of the evidence, the persistence or fla-

grancy of the remarks, and the instructions of the judge."
*Commonwealth* v. *Dougan,* 377 Mass. 303, 312 (1979).
*Commonwealth* v. *Earltop,* 372 Mass. 199, 203-204 (1977).
*Commonwealth* v. *Borodine,* 371 Mass. 1, 9 (1976), cert.
denied, 429 U.S. 1049 (1977).

The judge's instructions to the jury, which stated only in
general terms that the arguments of counsel are not evi-
dence did not cure adequately the prejudicial impact of the
prosecutor's assertion. In addition, proof of the defendant's
guilt was not overwhelming because it was tainted by the
inconsistencies in the identification and description of the
assailant. We note that there are substantial differences in
the appearance and physical characteristics of Clary and
Przygoda, the two women involved in the incident. Clary
is markedly taller than the other woman; Clary had short,
blonde hair, while Przygoda had dark, waist-length hair;
each woman was distinctively dressed as compared to the
other. The two witnesses, Davieau and Gully, who testi-
fied that Clary admitted the stabbing, can fairly be said to
have described, in the hours immediately after the stabbing,
a person closely resembling Przygoda as the woman who
made the admissions. The witness Dyer, who said she saw
Clary stab Spillane, also gave to the police, shortly after the
incident, a description of the assailant which fitted Przy-
goda rather than Clary. Thus, all the identifying witnesses
except the victim were subject to impeachment by proof of
prior inconsistent statements and, as to the victim's credi-
bility, he had concededly consumed a substantial quantity
of alcohol and drugs before the incident. Therefore, the
prosecutor's use of the television program to discount dis-
crepancies in the evidence struck at the heart of Clary's de-
fense. See *Commonwealth* v. *Smith,* 387 Mass. 900, 905
(1983); *Commonwealth* v. *Shelley,* 374 Mass. 466, 471
(1978).

Although this was overreaching argument amounting to
prosecutorial error, we think, standing alone, it would not
reach the level of error requiring reversal. Consequently,
we consider the two other areas of contested argument.

The prosecutor, in another line of argument, impermissibly characterized Clary as a lesbian and suggested that Clary's alleged stabbing of Spillane was motivated by a desire to defend Przygoda who, the argument implied, was sexually involved with Clary.[1] We emphasize that although the victim's statement that "those two 'lesies' stabbed me" was admissible, the prosecutor should have avoided any unnecessary reference to the prejudicial name-calling. The words "those two lesies," admitted as part of a spontaneous utterance, were merely an epithet and not proof of a lesbian relationship between the two women. Nor was there any other evidence of such a relationship offered or received during the trial. The scope of proper argument is limited to the evidence and the fair inferences from the evidence. *Commonwealth* v. *Hoppin*, 387 Mass. 25, 30 (1982), and cases cited therein.

The defendant argues persuasively that the prosecutor's overreaching comments were highly improper and "calculated to appeal to prejudice . . . and thus 'to sweep the jurors beyond a fair and calm consideration of the evidence,'" *Commonwealth* v. *Graziano*, 368 Mass. 325, 332 (1975), quoting *Commonwealth* v. *Perry*, 254 Mass. 520, 531 (1926), and that the prosecutor's insinuations regarding the defendant's sexual preference clearly were likely to instigate prejudice against her. See *United States* v. *Birrell*, 421 F.2d 665, 666 (9th Cir. 1970) (per curiam); *Killie* v. *State*, 14 Md. App. 465, 470-471 (1972); *Brown* v. *State*, 168 Tex. Crim. 67, 70-71 (1959).

We perceive another and more prejudicial aspect of the improper argument in that the prosecutor used the lesbian

---

[1] The prosecutor stated: "Well, we have all positions in life, don't we? *We all have different hangups.* . . . You heard Mr. Spillane say in plain language on the witness stand when he yelled to Mr. Davieau that 'lesie' stabbed me — [objection] . . . . What do you remember about cross-examination about that comment, about those words, that accusation, nothing, not one word is offered. . . . *Her* Denise was not going to be injured — that's *why she was there, [wasn't] it? how else do you explain her presence?* She's with another girl, the girl says my sister['s] been attacked . . . ." (emphasis supplied).

concept to bolster his contention that it was the defendant, not Przygoda, who used the knife. In pursuing this line, the prosecutor was again addressing the central issue of the case. It is apparent from his argument that the prosecutor recognized that to persuade the jury that it was the defendant, not Przygoda, who was the assailant, he had an additional factor to overcome; namely, that it was Przygoda who sought the quarrel with Spillane and it was Przygoda who was in turn assaulted by Spillane. The prosecutor chose to emphasize a lesbian relationship between the two women as proof of ,a motive for Clary to attack Spillane. Thus, a fact not proved directly or by fair inference — the alleged lesbian relationship — was used as a focal point in the prosecutor's argument. This was not a case in which overreaching argument was confined to collateral issues only, wherein either overwhelming evidence of the defendant's guilt or adequate curative instructions from the judge might have rendered the prosecutorial error harmless. *Commonwealth* v. *Shelley*, 374 Mass. 466, 470, 471 (1978), and cases cited. Rather, the prosecutor's overreaching argument "struck, and struck impermissibly, at the defendant's sole defense." *Shelley, supra* at 471.

The defendant also asserts error in that the prosecutor misstated evidence and argued unfounded inferences in discussing a knife which the defendant, Officer Almstrom, and the defendant's brother (also a police officer) found in Przygoda's car.[2] The prosecutor argued that the knife, which was not introduced in evidence, (1) was the assault weapon, (2) was in the defendant's car, (3) was withheld from evi-

---

[2] The prosecutor stated: "*A police officer's testimony under oath never even told me* while presenting the case to the jury he had examined a knife. *The* knife had been searched for by everybody. They searched the building, they searched the sewers, he never said one word. *For better or worse we die with our mistakes, don't we? If the knife were clean, could we not examine it? Could it not have proven innocence? But if the knife were bloody you don't want to have an examination.* Her brother and Officer Almstrom go from the police station with her, drive her back to *her* car because she tells them where a knife is. *The knife disappears.* What can you infer from that?" (emphasis supplied).

dence in a cover-up scheme, and (4) was "bloody" because the police failed to seize and test it. These arguments "went beyond any permissible inferences from the evidence." *Commonwealth* v. *Hawley,* 380 Mass. 70, 84 (1980). See *Commonwealth* v. *Smith,* 387 Mass. 900, 907-908 (1983); *Hoppin, supra* at 30; *Commonwealth* v. *Burke,* 373 Mass. 569, 575 (1977). The evidence as to a knife was that it was in Przygoda's car, not the defendant's, and that it was the defendant who told the police of its existence. There was no evidence that it was the knife involved in the stabbing.

The defendant did not object properly to the prosecutor's comments with regard to the defendant's alleged homosexuality or with regard to the knife.[3] Therefore, the defendant would not be entitled "as of right" to appellate review of these remarks, although we may review such errors to determine whether they created a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Fitzgerald,* 376 Mass. 402, 416 (1978). We conclude that in this case, where the proof that the defendant was the assailant was far from overwhelming, the combined effect of the three improper arguments by the prosecutor was sufficiently prejudicial to create a substantial risk of miscarriage of justice.

---

[3] With regard to the reference to the defendant's being a lesbian, the defendant objected during the prosecutor's argument, and the judge then indicated that he would take care of the prejudicial statements in his instructions. Defense counsel, however, did not renew her objection at the conclusion of the judge's charge. Since the judge in his charge did not make any attempt at corrective language specifically directed at the argument as to homosexuality, it was incumbent upon defense counsel to renew the objection after the charge. With regard to the argument relating to the knife, the defendant neither objected nor requested curative instructions. As we have in recent cases, we express our concern that an obviously improper argument which was treated aggressively and effectively by the defendant's appellate counsel (who was not trial counsel) proceeded at the trial without objection by the defendant's trial counsel.

4. We do not anticipate that the issue arising from defense attorney's motion to withdraw as counsel will arise at a new trial of this case, and for that reason there is no necessity to discuss the issue here.

*Judgment reversed.*

*Verdict set aside.*