COMMONWEALTH vs. EDWARD LORETTE.

No. 93-P-1590.

Berkshire. September 14, 1994. - December 19, 1994.

Present: SMITH, GILLERMAN, & IRELAND, JJ.

Further appellate review granted, 419 Mass. 1110 (1995).

*Evidence*, Fresh complaint, Credibility of witness, Sexual conduct. *Witness*, Credibility. *Child Abuse. Practice, Criminal*, Argument by prosecutor.

At the trial of indictments for sexual abuse of a child, gratuitous remarks of the Commonwealth's key witness, the child's mother, that went beyond the answer called for in questions on direct examination and that essentially endorsed the credibility of the child were improper [739-740]; where the judge, in addition, failed to give timely instructions on the limitations of fresh complaint testimony and where the prosecutor impermissibly appealed to the emotions of the jury in closing argument, the combined effect of the errors created a substantial risk of a miscarriage of justice [740-743].

INDICTMENTS found and returned in the Superior Court Department on November 8, 1990.

The cases were tried before *William W. Simons*, J.

*Carlo Obligato*, Committee for Public Counsel Services, for the defendant.

*Eric Neyman*, Assistant District Attorney, for the Commonwealth.

GILLERMAN, J. Following his conviction on counts charging rape and abuse of a child under the age of sixteen without force (G. L. c. 265, § 23), unnatural and lascivious acts on a child under the age of sixteen (G. L. c. 272, § 35A), and open and gross lewdness and lascivious behavior (G. L. c. 272, § 16), the defendant appeals claiming error in the introduction of testimony elicited from fresh complaint witnesses, and in the prosecutor's use of such testimony in his closing

argument. As the defendant's trial counsel[1] did not object to the introduction of the testimony now challenged, we must consider whether the testimony, if erroneously admitted, created a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967); *Commonwealth* v. *Miranda*, 22 Mass. App. Ct. 10, 21 (1986).

1. *The events surrounding the incident.* The Commonwealth presented evidence that the complainant (whom we shall call Sara[2]), six years old at the time of trial, and four years old at the time of the alleged incident, while visiting at the house of a friend (Trisha) of her older sister (Cathy), in July, 1990, was sexually abused by the defendant, Trisha's father. The incident allegedly occurred while Sara's sister Cathy and her friend Trisha went downstairs to get a drink, leaving the complainant alone in Trisha's bedroom upstairs. Sara testified that the defendant came out of the bathroom, pulled her pants down to her knees, and "put his finger in my privates. . . [and] wiggled it." He had put baby oil, which he got from the bathroom, on his finger for lubrication. She said he then "kissed my private" with "his lips" and then "made me kiss his private." Finally, she said he "peed on the bed" and that some of it went on her. He cleaned everything up, told her not to tell anybody, or he "would cut my private."

When Cathy and Trisha came back upstairs, the complainant, according to Cathy, was "just acting like she was when me and [Trisha] was up there, sitting there and playing with dolls."

It was not until September, 1990, that Sara disclosed to her mother what had occurred. She was with her mother at a babysitting job when she ran to her mother and said, "Mommy, mommy, the police just arrested a naked lady." Her mother became concerned and asked her why the lady was naked. The complainant then said "she was naked because she was sucking. . . . sucking a boy." According to the mother, this statement suggested that her daughter had been

---

[1]Appellate counsel was not trial counsel.
[2]The names of the children are fictitious.

molested. The mother told Sara, "I want to know if someone touched you," and repeatedly asked Sara, "who touched you?" Sara first identified "Michael," then "God." Eventually she identified Trisha's "daddy." The allegations were promptly reported to the police who met with Sara's parents the next day. The police recommended a physical examination of Sara.

The following day Sara was examined by her regular pediatrician. He found "a deep cleft inside the hymen, indicating a discontinuity in the hymen . . . . [This] was consistent with the penetration of an object in the vagina that was healed," but it was also consistent with an "irregular shaped hymen." The physician also related Sara's statements to him about the episode of alleged sexual abuse.

Sara met with Detective Collias the next day. Collias testified to Sara's statements of sexual abuse and that Sara, from an array of thirty-six photographs, identified the defendant as "the man that touched me on my private parts." Collias also interviewed the defendant; he denied the allegations.

The complainant's mother was called as a fresh complaint witness.[3] The following testimony was elicited on direct examination without objection or motion to strike by the defendant:

(1): Q. "Did you ever ask her if anything, or put any words in her mouth?"

A. "No, that I never did, that I never told her, I would never do that, especially to a four year old girl. *The stuff she came up with on her own and stuff she came up with certainly wasn't fabricated.*" (Emphasis supplied.)

(2): Q. "Did she keep talking about it?"

---

[3]The jury were not informed — at the time the mother testified — that she was testifying as a fresh complaint witness. See *Commonwealth v. Licata*, 412 Mass. 654, 660 (1992) ("The trial judge should instruct the jury as the [fresh complaint] evidence is admitted and again during the jury instructions that fresh complaint testimony does not serve as substantive evidence that the crime in fact occurred"). The judge did not instruct on the limited purpose of fresh complaint testimony until his final charge. See note 4, *infra*, for the judge's instructions during his final charge.

A. "Yes. As I said, it was a few days, as time went on, a little more, she would reveal. As I said, it was very hard for her."

Q. "Did you find out she had been left in the room alone?"

A. "Yes, because I had asked [Cathy] about that."

Q. "After?"

A. "Yeah. Then, of course, as I said, the way she was behaving and such, *everything just fit.*" (Emphasis supplied.)

(3) Q. "And she related who, in fact, had done this to her?"

A. "Yes."

Q. "Who was that?"

A. "[Trisha's] daddy. *She was always clear. In the year and a half gone by, almost two years, she was always clear on who is the man who did it to her, she never once strayed from anybody else but that man.*" (Emphasis supplied.)

2. *Discussion.* "Evaluations of credibility are, of course, within the exclusive province of the trier of fact." *Commonwealth* v. *Ianello*, 401 Mass. 197, 202 (1987), quoting from *Commonwealth* v. *Bohannon*, 376 Mass. 90, 94 (1978). Thus, "[i]t is improper to ask a witness to comment on the credibility of another witness." Liacos, Massachusetts Evidence § 6.5, at 265 (6th ed. 1994). See also *Commonwealth* v. *Triplett*, 398 Mass. 561, 567 (1986). The Commonwealth argues that the complainant's mother was merely responding to defense counsel's accusations "that the complaint stemmed from [the mother's] constant, suggestive questioning of her daughter," and that the mother's testimony "simply described her own actions — i.e. the daughter's testimony 'certainly wasn't fabricated' by . . . [the mother]."

While this is not a case involving a direct affirmation of the credibility of one witness by another, compare *Commonwealth* v. *Powers*, 36 Mass. App. Ct. 65, 68-71 (1994) (witness asked whether there was "any doubt in [her] mind [the complainant] is telling the truth"; the witness replied, "She's telling the truth"), testimony supporting the credibility of a witness need not be so direct. The question is whether the witness's testimony "*had the same effect* as if [the witness]

had directed his comments specifically to [another witness's] credibility" (emphasis supplied). *Commonwealth* v. *Montanino*, 409 Mass. 500, 504 (1991). The difficulty, as we have recently written, is "that the line between proper testimony as to patterns of disclosure of child sexual abuse victims and improper testimony constituting endorsement of the credibility of a victim-witness is indeed a narrow one." *Commonwealth* v. *Rather*, 37 Mass. App. Ct. 140, 148 (1994).

It is clear to us that the mother's testimony is much more than a denial that the mother suggested the accusation to Sara. In each of the quoted instances, the mother's answer went well beyond the question. Further, the gratuitous portions of her answers — the statements that Sara's testimony "wasn't fabricated," or that "everything just fit," or that "she never once strayed" — is in effect an affirmation that Sara's testimony was entirely truthful.

Moreover, the complainant was the Commonwealth's key witness. As in *Commonwealth* v. *Montanino*, 409 Mass. at 504-505, her "credibility was a crucial issue." Even if we view the mother's testimony as falling short of a direct affirmation of the credibility of the complainant, "we see little difference in the final result. It would be unrealistic to allow this type of . . . testimony and then expect the jurors to ignore it when evaluating the credibility of the complaining [witness]." *Id.* at 504, quoting from *Commonwealth* v. *Ianello*, 401 Mass. at 202. See also *Commonwealth* v. *Colin C.*, 419 Mass. 54, 61 (1994).

The more difficult issue is whether the improper testimony created a substantial risk of a miscarriage of justice. The question calls for a review of the trial proceedings.

3. *The substantial risk of a miscarriage of justice.* There are a number of factors to be weighed in the balance. On the Commonwealth's side is Sara's testimony. She displayed a familiarity with details of sexual conduct not likely known to a six year old child. While she initially wavered in her description of the person who assaulted her, once she identified the defendant from a photographic array, she adhered to that accusation. And even though the physical examination

of Sara did not yield definitive answers, the examining physician did leave it that "[b]ased on the history as well as the physical exam, I am fairly certain there was some vaginal penetration" — but without the history, "I can say this is either a healed laceration or a tulip hymen."

On the defendant's side is the testimony of Sara's sister, Cathy, that when she returned to her friend's bedroom, Sara was playing with the dolls and seemed entirely undisturbed, exactly as when Cathy left her. There was also the testimony of the defendant's wife and daughter, each of whom testified that Sara had already left the house when the defendant returned at noon for lunch — the time the alleged abuse occurred. Finally, there was the unequivocal denial of the charge by the defendant.

However, the compelling feature on the defendant's side is not the direct evidence — or lack of it — of the alleged crime, but the extent of the unfairness in the conduct of the trial.

The judge failed to give a timely instruction to the jury regarding the limitations on the fresh complaint testimony of the mother. See note 3, *supra.* Thus the jury likely understood, when the mother testified, that her testimony was admitted as substantive evidence of the alleged crime,[4] *and* as an affirmation of the truthfulness of Sara's testimony. Because the mother's testimony was doubly defective, and because Sara's credibility was a critical issue, the result was "especially pernicious," see *Commonwealth* v. *Powers,* 36 Mass. App. Ct. at 70, and the resulting prejudice to the defendant doubly harmful.

---

[4]The judge merely gave a standard fresh complaint instruction during his final jury instructions without specific reference to the mother's testimony. He said, "Statements of fresh complaint by the victim of a sexual crime made reasonably promptly under all of the circumstances are admissible for the limited purpose of corroboration of the victim's testimony. Of course, it is not positive evidence or direct proof that the events occurred. It is admitted solely for your consideration or for whatever light you feel it provides on your assessment of the truthfulness of [the complainant] on the witness stand in the trial."

In addition to the prejudicial errors just described, we add the following. The mother — a fresh complaint witness — was asked on direct examination, "What was your reaction [to your daughter's disclosures]?" To which she replied, "I was shocked, I was hurt, I was crying. I couldn't believe this had happened to her, I felt guilty." Sara's father, over the defendant's objection, was allowed to testify to his reactions to the episode. The prosecutor explained, "the jury should know he is here to support his family. . . ." The father then testified, "I cried, this whole thing has ruined my life." The defendant's motion to strike was denied. The testimony should have been struck. "[W]hen the question is *whether* the defendant committed the crime, luxuriating in the ghastliness of the crime and the suffering of the [victim's family] does not help to answer the question" (emphasis original). *Commonwealth* v. *McLeod*, 30 Mass. App. Ct. 536, 538-539 (1991).

The prosecutor picked up this impermissible thread in his closing argument: "You saw, and I am sure most of you felt the pain of what it was like to be the parents of a child that was molested. You saw [the father], how difficult it was . . . You saw [the mother] try to explain what had occurred on those days. That sick feeling that hit her stomach." Later in his argument, the prosecutor continued in this vein: "[Sara's family] came and *told you what was a nightmare of their life. What was the nightmare for their child for the rest of her life. A nightmare that will not go away.*" (Emphasis supplied.)

The remarks of the prosecutor in this case (not objected to by the defendant) are strikingly similar to the closing argument of the prosecutor in *Commonwealth* v. *Sanchez*, 405 Mass. 369, 375 (1989). There the prosecutor urged the jury to convict the defendant in order to end the victims' nightmares. The court ruled that the remarks went beyond the limit of permissible advocacy, *ibid.*, but held that the remarks of the prosecutor, standing alone, did not create a substantial risk of a miscarriage of justice because it was "quite unlikely that it would have made a material difference if the

prosecution had hewn to a discussion of the evidence. . . ." *Id*. at 376, quoting from *Commonwealth* v. *Cobb*, 26 Mass. App. Ct. 283, 287 (1988).

In this case, the closing argument of the prosecutor did not stand alone. First, as in *Commonwealth* v. *Clary*, 388 Mass. 583, 594 (1983), the Commonwealth's case was far from overwhelming. The critical choice was between the credibility of Sara and the credibility of the defendant, and it was precisely on that point that the prosecutor gained an advantage to which he was not entitled. The mother's testimony was erroneously allowed to support Sara's credibility and, at least initially, to add the force of her own testimony on a substantive, not simply corroborative, level. In addition to these plain errors was the prosecutor's unabashed appeal to the emotions of the jury by soliciting the emotional reactions of Sara's parents. The jury heard the details of the mother's extreme distress, as well as the father's declaration that his life had been ruined.

It is in this highly emotional context that the prosecutor's remarks — appealing to the jury to respond appropriately to the family's "nightmares" — must be judged. The standard is set forth in *Commonwealth* v. *Shelley*, 374 Mass. 466, 472 (1978) (the prosecutor is the representative of the sovereign whose interest in a criminal prosecution "is not that it shall win a case, but that justice shall be done," quoting from *Berger* v. *United States*, 295 U.S. 78, 88 (1935). See also *Commonwealth* v. *Kozec*, 399 Mass. 514, 516-520 (1987).

We are persuaded that justice in this case was not done, and that the combined effect of the errors was sufficiently prejudicial to create a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Clary*, 388 Mass. at 594. The judgment must be reversed and the verdict set aside.

*So ordered.*