SUPREME JUDICIAL COURT 
 
 COMMONWEALTH vs. DAVID J. CRONIN, JR.

 
 Docket:
 SJC-13598
 
 
 Dates:
 September 6, 2024 – January 7, 2025
 
 
 Present:
 Budd, C.J., Gaziano, Kafker, Wendlandt, Georges, Dewar, & Wolohojian, JJ.
 
 
 County:
 Middlesex
 

 
 Keywords:
 Obscenity, Child pornography. Cellular Telephone. Practice, Criminal, Witness. Evidence, Opinion, Expert opinion, Digital image. Witness, Expert.
 
 

             Complaint received and sworn to in the Lowell Division of the District Court Department on July 18, 2019.
            The case was heard by William T. Bailey, J.
            The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.
            Edward A. McNaught, III, for the defendant.
            Jessica Langsam, Assistant District Attorney, for the Commonwealth.
            Nathan A. Tamulis, Committee for Public Counsel Services, & Claudia Leis Bolgen, for Committee for Public Counsel Services & another, amici curiae, submitted a brief.
            GEORGES, J.  In July of 2019, the defendant, David J. Cronin, Jr., was charged with one count of possession of child pornography in violation of G. L. c. 272, § 29C.  After a bench trial in the District Court, the defendant was found guilty and appealed.
            On appeal, the defendant argues that the trial judge abused his discretion by allowing a lay witness to testify about technology used to extract data from a cell phone, a topic that the defendant contends required the testimony of an expert.  Although we agree with the defendant that the trial judge abused his discretion with respect to some of the contested testimony, we conclude that the error was nonprejudicial.  Accordingly, we affirm the defendant's conviction.[1]
            Background.  1.  Facts.  We summarize the relevant facts as the judge could have found them on the evidence presented at trial, reserving further details for later discussion.
            While shopping at a supermarket, a mother observed the defendant pointing his cell phone at "a weird angle" relative to the mother and her daughters.  The defendant subsequently approached the mother and denied taking photographs or capturing video recordings of the mother or her daughters.  Showing the mother his cell phone, the defendant started scrolling through the photographs stored on it.  Although the defendant did not display photographs or video recordings of the mother or her daughters, he did display what appeared to be several photographs of clothed women depicted from the waist down.  The photographs made the mother uncomfortable, and she asked the store manager to call the police.  Police Officer Alysia Columbus, who was at the store on an unrelated matter, commenced an investigation.
            The defendant, unprompted, gave Columbus his cell phone and permitted her to look through the photographs stored on it.  Upon viewing the photographs, Columbus observed "dozens and dozens" of photographs of clothed women depicted from the waist down.  After the officer stated to the defendant that he had "a lot of pictures of women's legs and feet," the defendant responded that there were "no pictures of young girls in there."  Columbus asked the defendant whether she could "look at everything" stored on the cell phone, and the defendant responded, "[Y]es."  After receiving the defendant's permission, Columbus discovered several images of what she believed were child pornography, located in the "screenshots" folder of the cell phone.[2]
            Columbus asked the defendant to accompany her to the store manager's office, where they were later joined by Police Officers Patrick Connor and Dennis Peterson.  After advising the defendant of his Miranda rights, see generally Miranda v. Arizona, 384 U.S. 436 (1966), Connor asked the defendant if he would permit the police to view the contents of the cell phone and have it forensically examined.  While verbally agreeing to the search,[3] the defendant stated that he had "some explaining to do" because he had "child pornography" stored on the cell phone.
            The defendant asserted that while using an online "chat room," he noticed child pornography and took screenshots for the purpose of reporting the images to the website's administrators.  However, when asked by Peterson whether he had reported the images, the defendant said that he had not done so or was not sure if he had done so.[4]  Columbus then placed the defendant under arrest for possession of child pornography.  After the defendant's arrest, a search warrant was issued authorizing a digital forensic analysis of the defendant's cell phone.
            2.  Procedural history.  The defendant was charged with one count of possession of child pornography in violation of G. L. c. 272, § 29C.  He waived his right to a jury trial.  At the conclusion of a bench trial, the trial judge found the defendant guilty and sentenced him to a term of six months in a house of correction, suspended for two years.  The defendant appealed, and we transferred the case to this court sua sponte.
            3.  Trial testimony of police officers.  a.  Images.  At trial, the Commonwealth presented testimony from Columbus, Connor, and Peterson regarding the images that they had viewed on the defendant's cell phone while at the supermarket.  Each witness testified to observing one or more images of a "prepubescent" child either nude or with the child's genitals exposed.
            Columbus described two images she viewed on the defendant's cell phone.  The first image depicted a "blond female," "approximately [ten] to [twelve] years old," wearing crotchless panties with her vagina exposed to the camera.  The second image depicted a nude female, about five to seven years old, who was "posed in a way that the camera was being shot at an angle in between her legs, up through her crotch and showing her face."
            On direct examination, the Commonwealth presented Connor and Peterson each with one of the two images identified by Columbus, and each confirmed that he had viewed the same image on the defendant's cell phone.  Before identifying the image, Connor testified that it depicted a nude female, approximately ten years old, positioned in such a way that "you could completely see [her] genitals, . . . [as t]here was nothing covering them."  Peterson recounted that the image he viewed, which had been taken "from the ground . . . pointing up," was of a female child, about nine to twelve years old, wearing crotchless underwear.
            b.  Cellebrite system.  Through the testimony of Police Officer Michael McLaughlin, the Commonwealth sought to explain a forensic analysis performed on the defendant's cell phone and to introduce images and digital evidence retrieved from the cell phone using a Cellebrite system.[5]  Before McLaughlin took the stand, defense counsel objected to McLaughlin "testify[ing] to anything technical that is beyond the expertise of a layperson," because the Commonwealth had not fulfilled its expert witness disclosure obligations under Mass. R. Crim. P. 14, as appearing in 442 Mass. 1518 (2004).  The prosecutor denied that she was presenting McLaughlin as an expert witness, reasoning that McLaughlin would testify on the contents of a forensic analytical report "that a layperson can read."  The trial judge deferred ruling on the defendant's objection, stating, "As to the context of [McLaughlin's] testimony, . . . we'll address that once we get there."
            While testifying, although McLaughlin explained his credentials and prior experience with the Cellebrite system, he conceded that he did "not consider [him]self an expert on [analyzing] cell phones."  McLaughlin testified that he was a certified Cellebrite system operator, due to having attended a five-day certification course, and that he had used the Cellebrite system forty-six times.
            McLaughlin also explained the process of retrieving data from a cell phone using the Cellebrite system, which he described as a system that "decodes data" contained on an electronic device and organizes the information in a searchable format.  According to McLaughlin, to utilize the Cellebrite system to forensically examine a cell phone, he physically connects the cell phone to a computer using wires and runs the Cellebrite Universal Forensic Extraction Device, or UFED,[6] which, in simple terms, extracts the cell phone's data.  When asked whether the Cellebrite system can "manipulate or change the data on the [cell] phone" or whether there was any "possible risk that any other data can transfer onto the [cell] phone," McLaughlin responded, "No."  The extracted data is then saved in a file that can be "read by [a] Cellebrite program called Cellebrite Physical Analyzer," which organizes the data into a "user-friendly" searchable format and can generate extraction reports on the data.  McLaughlin testified that the resulting extraction reports are readable by a lay person without Cellebrite system training.[7]
            McLaughlin further testified concerning the steps that he took to extract data from the defendant's cell phone using the Cellebrite system.  McLaughlin first placed the cell phone in "airplane mode" and switched off its Wi-Fi[8] and Bluetooth[9] functions to prevent the cell phone from being accessed remotely.  McLaughlin then enabled "USB debugging" and the "stay awake" functions on the cell phone and, connecting the cell phone to his computer with wires, "plugged [the cell phone] into the Cellebrite system."  Finally, McLaughlin saved the data extracted from the cell phone onto the computer and "ran it [through Cellebrite] Physical Analyzer," which produced an extraction report.[10]
            Through McLaughlin's testimony, the Commonwealth, over objection, entered in evidence fifteen images that McLaughlin had extracted from the defendant's cell phone using the Cellebrite UFED.[11]  The images depicted young children naked or partially clothed with their genitals exposed and young children engaged in or posed engaging in sexually explicit acts while naked.  When asked whether the images extracted from the defendant's cell phone had been "changed or altered in any way," McLaughlin responded, "No."
            In addition to testifying about the Cellebrite system and the results it yielded, McLaughlin defined several general technical terms during direct examination.  In response to the prosecutor's inquiry into the types of data that can be extracted, McLaughlin responded that the Cellebrite UFED extracts, among other things, an image's "metadata."[12]  When asked to explain what he meant by "metadata," McLaughlin stated that metadata "usually" consists of the "date, time, . . . and where the file was saved to."  Additionally, McLaughlin described "cookies,"[13] another category of data extracted by the Cellebrite UFED, as "bits and pieces of information that are left . . . from a [visited] website."  Further, in explaining the meaning of "cached,"[14] in relation to the images extracted from the defendant's cell phone, McLaughlin stated that "cached photographs are from the first time you visit a website or an application, so that way you can save data to your device so the next time that you go there it has it already."
            Through McLaughlin, the Commonwealth introduced in evidence the fifteen images and portions of the extraction report, over defense counsel's repeated objections.  In allowing the Commonwealth to do so, the trial judge reasoned that McLaughlin was not testifying as a "qualified expert" on the Cellebrite system or cell phones generally, but rather, McLaughlin merely knew how to "plug the cell phone into the computer" and "read[] whatever it spits out."  The trial judge further explained that, "as it pertains to how the extraction happens, [McLaughlin is] not testifying to that, and I won't allow him to testify to that.  But as to what the information is that he received [from the Cellebrite system], I do find that he is able to [testify] based upon his training and experience."
            Discussion.  On appeal, the defendant asserts that the trial judge erred in allowing McLaughlin to testify as a lay witness on several topics, including the Cellebrite system, the results obtained from the data extraction, and various technical concepts.  The defendant contends that these topics required the testimony of an expert.  See Commonwealth v. Bundy, 465 Mass. 538, 546 (2013); Mass. G. Evid. § 702 (2024).
            "We review evidentiary decisions of the trial judge for an abuse of discretion."  Commonwealth v. Huang, 489 Mass. 162, 172 (2022).  The trial judge abuses his discretion when he "ma[kes] 'a clear error of judgment in weighing' the factors relevant to the decision . . . such that the decision falls outside the range of reasonable alternatives."  L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).  Where, as here, "purportedly improper opinion evidence [is] objected to at trial, we review . . . for prejudicial error."  Commonwealth v. Grier, 490 Mass 455, 475-476 (2022).
            1.  Lay versus expert opinion testimony.  At trial, an expert witness may offer an opinion that will assist the jury in understanding a fact in issue when it is based on "scientific, technical, or other specialized knowledge."  Commonwealth v. Canty, 466 Mass. 535, 541 (2013).  See Commonwealth v. Wilson, 441 Mass. 390, 401 (2004) ("The role of an expert witness is to help jurors interpret evidence that lies outside of common experience" [citation omitted]); Mass. G. Evid. § 702.  Lay witness opinion, on the other hand, is admissible where it is "(a) rationally based on the perception of the witness; (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge."  Canty, supra, quoting Mass. G. Evid. § 701 (2013).
            The question whether a witness requires expert qualifications to testify regarding a Cellebrite system is a matter of first impression for this court; however, the United States Courts of Appeals have grappled with this issue on several occasions.[15]  Among the Federal cases, United States v. Williams, 83 F.4th 994 (5th Cir. 2023), is particularly instructive.
            In Williams, following the defendant's arrest for sex trafficking of a child, an investigator plugged the defendant's cell phone into a Cellebrite device, which "provided [data] to the police in an accessible, easily-navigable, and readable format."  Williams, 83 F.4th at 995.  At trial, over the defendant's objection, the investigator testified to "(1) his certifications as a Cellebrite Operator . . . , (2) the data-extraction process, and (3) the evidence he obtained."  Id. at 996.  The defendant was convicted, and he appealed, "claim[ing] that it was reversible error for the court to admit the Cellebrite testimony without an expert witness and a finding of reliability."  Id.  In rejecting the defendant's argument, the United States Court of Appeals for the Fifth Circuit reasoned:
"All the investigator testified to was how he downloaded the information from the phone[] using Cellebrite technology.  At no point did he speak to the reliability of the software . . . .  [H]e did not state any information on how Cellebrite operated in a technical sense, nor information that was beyond the knowledge of an average cell phone user.  The investigator did not 'implicitly vouch for the accuracy or reliability of Cellebrite's software,' as [the defendant] claims.  Rather, the investigator acknowledged his lack of knowledge about the software and stated that he was merely an operator."
Id. at 997.  The court concluded that "[w]ithout a showing of specialized knowledge, the mere use and understanding of a Cellebrite extract at trial is insufficient to require an expert," and accordingly affirmed the defendant's conviction.  Id. at 998.
            In contrast, in United States v. Wehrle, 985 F.3d 549, 554 (7th Cir. 2021), the United States Court of Appeals for the Seventh Circuit held that a trial judge abused her discretion by failing to formally qualify a police officer as an expert before admitting her testimony about Cellebrite software.  In her testimony, the officer "described the reliability and safeguards in the [Cellebrite] software that prevent any alteration of the original data" along with other technical concepts, such as metadata.  Id.  Although the court recognized that "not all testimony about the use of 'technical' equipment will implicate [Fed. R. Evid.] 702," it noted that "even if a lay person may understand an officer's testimony about one of these [technical] concepts in isolation, an explanation of how they work together to preserve information and the integrity of the data crosses into Rule 702 territory."  Id.  The court concluded that the contested testimony went beyond ordinary knowledge and, therefore, constituted "specialized knowledge" under Rule 702.  Id.
            As these cases make clear, the mere fact that McLaughlin's testimony concerned the Cellebrite system is not dispositive as to whether that testimony constituted expert opinion; instead, we must ask whether the testimony "require[d] any specialized knowledge."  Commonwealth v. Mason, 485 Mass. 520, 538 (2020).  Further, we must determine whether McLaughlin's testimony was based on his personal observations.  See id.
            2.  McLaughlin's testimony.  Considering the above parameters, we initially determine that most of McLaughlin's testimony regarding the Cellebrite system and the extraction process was appropriately admitted as lay opinion testimony.  First, the trial judge had a sufficient basis to conclude that McLaughlin's testimony was rationally based on his perception.  McLaughlin explained that he attended a five-day certification course on the Cellebrite system and had used the system over forty times.  Additionally, he personally extracted the data from the defendant's cell phone.  Therefore, McLaughlin's testimony about the general extraction procedure and the specific extraction procedure he used for the defendant's cell phone was "based on [his] personal knowledge."  Commonwealth v. Fernandes, 492 Mass. 469, 481-482 (2023) (no error where lay witness testimony explained slang terms because witness had "sufficient familiarity with the slang terminology" based on experience as drug dealer and friendship with defendant).  See Mason, 485 Mass. at 538 (witness's lay opinion testimony that charred fragments were portions of map from website was properly admitted because testimony was based on witness's personal observations that "did not require any specialized knowledge"); United States v. Montijo-Maysonet, 974 F.3d 34, 48 (1st Cir. 2020), cert. denied, 142 S. Ct. 145 (2021) (pursuant to Fed. R. Evid. 701, police officers are allowed to testify about "particularized knowledge" they gain "on the job" if it is "well founded on [their] personal knowledge").
            Second, McLaughlin's testimony on the extraction process was not, except as otherwise specified infra, based on scientific, technical, or other specialized knowledge.  See Mason, 485 Mass. at 538; Mass. G. Evid. § 701.  McLaughlin described the basic steps he undertook to extract data from the defendant's cell phone, which involved connecting the cell phone to a computer, initiating the Cellebrite system, and using Physical Analyzer to narrow the search parameters.  See United States v. Chavez-Lopez, 767 Fed. Appx. 431, 434 (4th Cir. 2019) (witness did not give expert testimony where he testified "concern[ing] the actions he took to extract the data [from the defendant's cell phone] -- hooking the phone[] up to a computer, following a few prompts, and saving data onto an external drive").  Likewise, McLaughlin's explanation of the contents of the Cellebrite extraction report required no scientific, technical, or specialized knowledge.[16]  See United States v. Jimenez-Chaidez, 96 F.4th 1257, 1267 (9th Cir. 2024) (lay opinion testimony properly admitted where Cellebrite report format was "easily understandable to anyone familiar with GPS coordinates").  The trial judge, therefore, did not abuse his discretion in admitting this testimony as lay opinion.
            That said, some of McLaughlin's testimony crossed the line into impermissible expert opinion.  McLaughlin's claims about Cellebrite's accuracy and reliability –- such as its safeguards against data alteration –- required specialized, expert knowledge.  See Wehrle, 985 F.3d at 554 (testimony on data-extraction software's reliability and safeguards against data alteration implicated Fed. R. Evid. 702).  This testimony was inadmissible as it went "beyond the common knowledge or understanding of the [average] lay juror" (citation omitted).  Bundy, 465 Mass. at 546.
            Finally, McLaughlin's explanation of technical concepts -- such as cookies, metadata, and cache -- poses a closer call.  On the one hand, "[c]ourts routinely conclude that the interpretation and analysis of metadata requires an expert qualified in the field."  Allegis Group, Inc. v. Bero, 689 F. Supp. 3d 81, 108 (D. Md. 2023) (collecting cases).  On the other hand, computers, cell phones, and other electronic devices are ubiquitous.  See Commonwealth v. Caruso, 476 Mass. 275, 289 (2017).  Given this technological ubiquity, basic technical terms and concepts may be within the common understanding of lay people.  See Mason, 485 Mass. at 538 (witness's testimony concerning her Internet search constituted lay opinion).  See also State v. Webb, 2023-Ohio-4050, ¶ 37 (Ct. App.) ("The trial court did not abuse its discretion when it allowed the state to introduce the metadata without expert testimony . . . [given that a] layperson could understand, without expert help, that the information which appeared includes the date, time, and order in which the photos were taken").  Nevertheless, even assuming that the admission of this testimony was erroneous, as explained below, any error was nonprejudicial.  See Dusel v. Factory Mut. Ins. Co., 52 F.4th 495, 512 (1st Cir. 2022) (determining that assumed error in admitting lay opinion as expert opinion was harmless).
            3.  Prejudice.  The defendant argues that the erroneous admission of McLaughlin's testimony caused him prejudice because it led to the introduction of the images in evidence.  We disagree.
            "An error is nonprejudicial only when we are sure that the error did not influence the [fact finder], or had but very slight effect" (quotation and citation omitted).  Commonwealth v. Federico, 425 Mass. 844, 852 (1997).  One relevant factor in the analysis is "the strength of the Commonwealth's case."  Commonwealth v. Peno, 485 Mass. 378, 399 (2020), citing Commonwealth v. Clary, 388 Mass. 583, 590-591 (1983).
            Here, the evidence against the defendant was overwhelming.  To begin, separate and apart from McLaughlin's testimony, Columbus, Connor, and Peterson each observed at least one image of child pornography on the defendant's cell phone.  Indeed, according to the testimony from Connor and Peterson, the defendant himself admitted to possessing child pornography on his cell phone.
            Additionally, despite the defendant's argument to the contrary, the fifteen sexually explicit images of the "prepubescent" children were properly admitted in evidence through McLaughlin's lay testimony on his use of the Cellebrite system and the extraction process.  Of note, McLaughlin testified, based on the extraction report, that each of these images entered in evidence was either located in the defendant's "screenshots" folder or saved directly to the defendant's cell phone.  For example, McLaughlin verified that the image that Columbus, Connor, and Peterson each testified to observing on the defendant's cell phone at the supermarket was located in the "screenshots" folder on the defendant's cell phone.
            Finally, in addition to the strong evidence against the defendant, McLaughlin admitted he was not an expert, further reducing the risk that his improper opinion testimony influenced the judge.  See Canty, 466 Mass. at 545 ("even where the lay opinion is offered by a police officer," jury are less likely to "forego independent analysis of the facts and bow too readily to the opinion where it is not reached through the specialized knowledge of an expert" [quotation and citation omitted]); Montijo-Maysonet, 974 F.3d at 49-50 (any error in admitting officer's testimony regarding technical aspects of government's forensic software was "harmless" where, although officer had not been qualified as expert, officer clarified she had no "training in forensic tools").
            Conclusion.  In conclusion, we are sure, given the significant evidence against the defendant paired with McLaughlin's express disavowal of his expertise, that any improper testimony from McLaughlin about the Cellebrite system's reliability or technical concepts did not influence the fact finder or had but very slight effect.  Therefore, we affirm the judgment.
            So ordered.
 
--------------------------------------------
 
            [1] We acknowledge the amicus brief submitted by the Committee for Public Counsel Services and the Massachusetts Association of Criminal Defense Lawyers in support of the defendant.
            [2] A screenshot is a "copy of the image displayed by a computer screen."  American Heritage Dictionary of the English Language 1576 (5th ed. 2018).
            [3] The defendant also signed a form consenting to a forensic examination of his cell phone by the police as well as a form stating that he had voluntarily handed Columbus his cell phone.
            [4] Both Connor and Peterson testified that, according to the defendant, he had not reported the images.  However, on cross-examination, Connor testified that the police report he wrote indicates that the defendant was unsure if he had reported the images.
            [5] "Cellebrite is a company that manufactures data extraction, transfer, and analysis devices for cellphones and mobile devices."  United States v. Brown, 308 F. Supp. 3d 620, 625 n.8 (D.R.I. 2018).
            [6] Cellebrite UFED allows users to collect data from a wide range of mobile devices, including cell phones; drones; and global positioning system, or GPS, devices.
            [7] Specifically, when asked on direct examination whether a Cellebrite extraction report was "something that a layperson would be able to look at and view" and whether the information contained therein was assembled "in a way that you or I could read," McLaughlin answered, "Yes."  According to McLaughlin, the extraction reports are arranged into several categories, including "account information," along with "images, SMS [(short message service)], MMS [(multimedia messaging service)], contact lists, cookies, [and] web and search history."
            [8] Wi-Fi is "a system for connecting electronic equipment such as computers and electronic organizers to the internet without using wires."  Cambridge Dictionary Online, https://dictionary.cambridge.org/us/dictionary/english/wi-fi [https://perma.cc/W3QQ-YYAN].
            [9] Bluetooth is "a brand name for a system for connecting electronic equipment such as cell phones, computers, and electronic organizers to each other and to the internet using radio signals."  Cambridge Dictionary Online, https://
dictionary.cambridge.org/us/dictionary/english/bluetooth [https://perma.cc/A8PC-EEUD].
            [10] Portions of the resulting extraction report were admitted in evidence through McLaughlin.  These portions concerned e-mail messages, cookies, and photographs (with accompanying metadata) extracted from the defendant's cell phone.  See discussion infra.
            [11] Among the images admitted was the first image that Columbus described in her testimony.
            [12] Metadata is data "that describes other data, as in describing the origin, structure or characteristics of computer files, webpages, databases, or other digital resources."  American Heritage Dictionary of the English Language 1105 (5th ed. 2018).
            [13] Cookies are a "collection of information, usually including a username and the current date and time, stored on the local computer of a person using the World Wide Web, used chiefly by websites to identify users who have previously registered or visited the site."  American Heritage Dictionary of the English Language 403 (5th ed. 2018).
            McLaughlin testified that the "cookies" component of the extraction report showed that on nine occasions the defendant had visited a website from which some of the images in question had been "screenshotted."
            14 A cache is a "computer memory with very short access time used for storage of frequently or recently used instructions or data."  Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/cache [https://perma.cc/7DSC-WTQY].
            McLaughlin testified that none of the images obtained from the defendant's cell phone was either "cached" from visiting a website or application, or "inadvertently downloaded onto the [cell] phone."  This testimony, in conjunction with McLaughlin's testimony identifying those images as "screenshots," implied that the defendant had deliberately saved these images to his cell phone.
            [15] See, e.g., United States v. Jimenez-Chaidez, 96 F.4th 1257, 1267 (9th Cir. 2024) ("lay witness may testify to the information extracted from a phone [using Cellebrite system] so long as the testimony does not require 'specialized knowledge'" [citation omitted]); United States v. Williams, 83 F.4th 994, 995 (5th Cir. 2023) ("When law enforcement uses Cellebrite to pull information from a phone and a lay juror would require no additional interpretation to understand that information, the party does not need to introduce the evidence through an expert"); United States v. Wehrle, 985 F.3d 549, 554 (7th Cir. 2021) (expert qualification required where witness testified to reliability and technical aspects of forensic examination); United States v. Chavez-Lopez, 767 Fed. Appx. 431, 434 (4th Cir. 2019) (lay testimony on Cellebrite system proper where witness "offered no assurances about how well Cellebrite performed," but instead "offered the opinion that Cellebrite copies data from a cellphone, which he derived from his personal experience using the software").
            [16] Having reviewed the portion of the Cellebrite extraction report that was introduced in evidence, we also conclude that the report itself was properly admitted.  As McLaughlin testified, a lay person is capable of "look[ing] at and view[ing]" the information in the extraction report.  The extraction report in this case includes basic information, such as each image's file name along with its source, size, date, and time.  See Commonwealth v. Caruso, 476 Mass. 275, 289 (2017) ("Jurors may rely on their own common sense and life experience in their role as fact finders. . . .  Evidence that a time stamp indicates a particular time is a sufficient basis for a jury to conclude that the relevant activity took place at that time . . ."); Commonwealth v. Middleton, 100 Mass. App. Ct. 756, 761 (2022) (concluding expert testimony not required for jurors to understand date and time information in Google records).