NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReportersjc.state.ma.us

SJC-12396


COMMONWEALTH  vs.  ANGEL LUIS ALVAREZ.



Worcester.     January 8, 2018. - August 22, 2018.

Present:  Gants, C.J., Lenk, Gaziano, Lowy, Budd, Cypher, &
Kafker, JJ.



Rape.  Indecent Assault and Battery.  Evidence, Expert opinion.
    Witness, Expert.  Practice, Criminal, Argument by
    prosecutor, Instructions to jury.




    Indictments found and returned in the Superior Court
Department on August 22, 2014.

    The cases were tried before Daniel M. Wrenn, J.

    The Supreme Judicial Court granted an application for
direct appellate review.


    David Rassoul Rangaviz, Committee for Public Counsel
Services, for the defendant.
    Nathaniel R. Beaudoin, Assistant District Attorney, for the
Commonwealth.


    GANTS, C.J.  A Superior Court jury found the defendant,

Angel Alvarez, guilty on indictments charging three counts of

rape of a child and one count of indecent assault and battery

upon a child.  The defendant presents three claims of error on appeal:  first, that the prosecutor misstated important evidence in closing argument; second, that the judge erred by admitting expert testimony from the treating physician of the victim; and third, that the judge's instructions unfairly limited the jury's consideration of a defense based on the inadequacy of the police investigation, known as a Bowden defense.  See Commonwealth v. Bowden, 379 Mass. 472, 485-486 (1980).  We conclude that the prosecutor's closing argument was prejudicial error, where she told the jury of critical corroborative evidence that was not presented at trial.  We therefore vacate the defendant's convictions and remand the case to the Superior Court for a new trial.  We address the defendant's other two claims of error because they are likely to recur at a new trial.  We conclude that the judge did not abuse his discretion in admitting the expert opinion of the treating physician where it could not reasonably be understood by the jury as implicitly vouching for the complainant's credibility.  We also conclude that the judge did not unfairly limit the jury's consideration of the Bowden defense by instructing the jury to decide the case based solely on the evidence.

Background.  The strength of the Commonwealth's evidence in this case rested on the credibility of Camila,[1] a twelve year old girl who recounted acts of sexual abuse by the defendant that had allegedly occurred on various occasions when she was between the ages of six and nine.  The defendant is Camila's godfather, and is married to Camila's aunt; Camila thinks of the defendant as her uncle and refers to him as "tio."

When Camila was six years old, the defendant and several relatives were at her house for a party.  The defendant asked her to come with him to pick up her cousin to bring back to the party.  Camila refused because she was having fun.  The defendant "begg[ed]" Camila's mother for Camila to accompany him and her mother agreed.  The defendant drove to his house and told Camila he needed something from inside.  Camila wanted to stay in the vehicle, but the defendant insisted that she come inside the house.  As the defendant looked for something, Camila sat on an air mattress in one of the bedrooms.  The defendant walked in and took off his pants and underwear.  He pulled down Camila's skirt and underwear.  He laid down on the bed and "put [Camila] on top of him" and "his penis touched [her] vagina."  The sexual assault lasted approximately one minute; the defendant then went to the bathroom.  Camila testified that her vagina felt "sticky," "wet, and disgusting."

_____

[1] We use a pseudonym for the child.

The defendant and Camila left the house and drove to pick up her cousin.  On the way, Camila told the defendant that her vagina was hurting.  The defendant was "surprised" and asked "why it was hurting."  She said that she did not know why she was in pain.  The defendant told her to not tell her mother.  After picking up Camila's cousin the defendant drove back to Camila's house.

Camila testified that, once she was home, she felt "wet and sticky and gross," and asked her mother if she could shower.  She ultimately did not shower again because she had showered approximately one hour before leaving the house; instead, she played with her cousins.

The defendant worked as a taxicab driver and would sometimes pick up Camila from school in a taxicab.  On four to six occasions, when Camila was six or seven years old, the defendant drove her to a fast food restaurant and parked the taxicab behind the restaurant.  There, he would place his hand under Camila's pants and underwear and into her vagina.

When Camila was six or seven years old, she was in a hallway in the defendant's apartment, waiting for him to drive her home for a family event.  Camila's aunt was in another room getting ready.  The defendant walked into the hallway, pulled down his pants and underwear, and put his penis in Camila's

mouth.  The defendant told her to "suck it and do it."  After approximately one minute, Camila pushed the defendant away.

When Camila was approximately eight years old, the defendant on two separate occasions stood behind her in the same hallway and rubbed his penis on her buttocks.  On another occasion, when she and the defendant's niece were both sleeping at his house on different couches in the same room, the defendant put his hand under Camila's blanket and inside her vagina.  Camila woke up, said "[o]w," and pushed him away.

Every time Camila slept at the defendant's house, he tried to assault her.  She would respond by pushing and kicking him, and the defendant would remain quiet and walk out of the room.

When Camila was nine years old, soon after the assault on the couch, she was home, celebrating New Year's Eve with the defendant's niece.  The defendant's niece wanted Camila to sleep at the defendant's house, but Camila did not want to.  The defendant "kept begging" Camila's mother to allow Camila to sleep over until she acquiesced.  Once at the defendant's house, Camila said she was hungry and asked the defendant for food.  After the defendant told her he had no food and no money for food, Camila said, "I just want to go home, I want to go home."  The defendant "screamed" at her, "Just go home, then, go home."  The defendant's niece drove Camila to a fast food restaurant and then drove her home.

Approximately two weeks later, Camila was talking with her mother and one of her sisters. Someone mentioned the defendant, and Camila started crying. After her mother and sister asked why she was crying, Camila disclosed that the defendant had assaulted her multiple times.

Soon after disclosing that the defendant had been assaulting her, Camila was examined by Dr. Heather C. Forkey, a pediatrician who specialized in caring for children who have been victims of abuse. Dr. Forkey testified at trial that Camila did not exhibit or report any of the common behavioral symptoms of abuse -- including nightmares, bed-wetting, difficulty in school, and running away from home. She also testified that Camila's genital examination was "normal" for a nine year old girl, and that there were no signs of genital injury. When the prosecutor asked Dr. Forkey to offer an expert opinion as to whether "it is or is not common to find physical injuries during the genital exam of someone that has been sexually abused," the defendant objected. Dr. Forkey answered, "It's very uncommon," before the judge sustained the objection on the grounds that the question "stray[ed] too close to the credibility component of the case." Mistakenly believing that Dr. Forkey had not answered the question, the judge denied the defendant's motion to strike any response to the question. At the conclusion of her direct testimony, without objection, Dr.

Forkey testified that "[t]he absence of physical trauma is not inconsistent with abuse."

When the defendant was interviewed by the police about these allegations, he admitted that he had spent time with Camila "almost every day," that she would "always hang out" with him and "always call" him, but he insisted that he had never touched her in a sexual manner. When asked by the police if Camila had ever "come on" to him, he stated that she never had, and he denied having "any feelings like that towards her." He declared, "I [have] always been good to this family; I [have] never hurt [them]." When asked why Camila would say that he abused her if it were not true, he answered, "I don't know." When the interrogating police officer falsely told the defendant that she knew that he had kept photographs of young girls on his cellular telephone, thinking that this "bluff" would cause the defendant to confess, he adamantly denied ever having taken such photographs or keeping any on his cellular telephone. There was no evidence at trial that the defendant possessed any child pornography or photographs of children, and no evidence of bad acts towards any other child.

The defendant appealed his convictions, and we granted his application for direct appellate review.

Discussion. 1. Prosecutor's closing argument. As noted, Camila testified that, when she was six years old, after the

first alleged sexual abuse incident with the defendant, she "felt wet and disgusting" because of a "sticky" substance around her vagina. She also testified that, when she was nine years old and told her mother and sister about her sexual abuse, she spoke of this aspect of the incident and said: "I told them how I felt gross and wet; that's why I wanted to take the shower." This was the only sexual incident in which there was any indication that the defendant had ejaculated, so corroboration from a source other than Camila that she felt "wet and sticky" would strongly corroborate her testimony regarding that incident. The prosecutor recognized the importance of this corroborative evidence by telling the jury during her opening statement that Camila would testify that, after she returned home and told her mother that she needed to "take a tub or a shower," "[h]er mom said, 'Why? You just took one before you left, a few hours ago.'" However, when Camila testified, she testified only that she had asked her mother whether she could take a shower, but that she did not shower because she had taken one an hour before she had left home. She was not asked what her mother said in response to her desire to take a shower, and did not testify as to any statement made by her mother regarding that incident.

When Camila's mother testified, the prosecutor did not ask about this incident; the mother said nothing about Camila asking

to "take a tub or a shower," or her saying she felt "wet," "disgusting," or "sticky" when she came home.  On cross-examination, defense counsel asked Camila's mother to read the police report reflecting what she had told the detective after Camila's first complaint regarding this particular incident, and the following dialogue ensued:

> Q.:  "And . . . you told the detective about the first incident that [Camila] told you about?"
>
> A.:  "Yes."
>
> Q.:  "And that's when [the defendant] was at your house, and was supposed to go pick up some other cousins?"
>
> A.:  "Yes."
>
> Q.:  "And you told the detective that he asked if he could take [Camila]?"
>
> A.:  "Yes."
>
> Q.:  "And she asked you, 'Mommy, can I go with tio to pick up the kids'?"
>
> A.:  "Yes."
>
> Q.:  "And you said 'Yes; go ahead'?"
>
> A.:  "Yes."
>
> Q.:  "And when she got home that day, she didn't tell you that [the defendant had] hurt her?"
>
> A.:  "No."
>
> Q.:  "She didn't tell you that she didn't want to see him [anymore]?"
>
> A.:  "No."

Q.:  "And she wanted to play with the other kids that were around?"

A.:  "No, because there wasn't anybody."

Q.:  "There were no kids around when she came home that first day?"

A.:  "There weren't children."

Q.:  "Who was around?"

A.:  "Us -- the same people as always.  He went to go pick up the girls, but I never saw the girls."

Consequently, there was no testimony elicited at trial, either from Camila or her mother, regarding what the mother had said when Camila returned home from that incident, and no corroboration by the mother that Camila wanted to clean herself when she returned home that day.  However, during closing argument, the prosecutor, in answer to defense counsel's argument that the case rested solely on the words of Camila, said:

> "the Commonwealth submits that's not true.  You have some corroboration  . . . of [Camila's] word in other forms. You have her mom saying  . . . she told you how that first time she came home and asked to take a bath, because she felt disgusting?  Mom told you, 'She did come home one day and ask to take a bath, and I thought it was weird, because she had taken a bath that morning.'  That's corroboration."

Defense counsel objected at the end of the prosecutor's closing argument, informing the judge that there was no evidence that the mother provided any corroboration of Camila's testimony that she told her mother she needed to bathe.  Neither the

prosecutor nor the judge recalled whether the mother had offered this testimony, and defense counsel herself said that she might have been mistaken about it. The judge refused to give any curative instruction. Instead, the judge told the jury during his instructions that they are "the sole and exclusive judges of the facts," and that "opening statements and the closing arguments of the lawyers are not a substitute for the evidence," but are simply intended to assist the jury in understanding the evidence.

Under our case law, "[w]hile prosecutors are entitled to argue 'forcefully for the defendant's conviction,' closing arguments must be limited to facts in evidence and the fair inferences that may be drawn from those facts." Commonwealth v. Rutherford, 476 Mass. 639, 643 (2017), quoting Commonwealth v. Wilson, 427 Mass. 336, 350 (1998). See Commonwealth v. Silva-Santiago, 453 Mass. 782, 807 (2009). Where, as here, the prosecutor argued facts in closing argument that find no support in the evidence at trial and where that error is preserved by a timely objection, the error is nonprejudicial only if we are "sure that the error did not influence the jury, or had but very slight effect." Commonwealth v. Hrabak, 440 Mass. 650, 656 (2004), quoting Commonwealth v. Flebotte, 417 Mass. 348, 353 (1994). "Where it cannot be said with assurance that the improper closing argument could not have influenced the jury to

convict, the judgment of conviction cannot be preserved." Commonwealth v. Beaudry, 445 Mass. 577, 586 (2005), quoting Commonwealth v. Kelly, 417 Mass. 266, 272 (1994). See also Commonwealth v. Mountry, 463 Mass. 80, 92 (2012).

We consider four factors in determining whether an error made during closing argument is prejudicial: "(1) whether the defendant seasonably objected; (2) whether the error was limited to collateral issues or went to the heart of the case; (3) what specific or general instructions the judge gave the jury which may have mitigated the mistake; and (4) whether the error, in the circumstances, possibly made a difference in the jury's conclusions." Silva-Santiago, 453 Mass. at 807, quoting Commonwealth v. Perez, 444 Mass. 143, 151 (2005). Here, the defendant objected in a timely manner to the factually incorrect statement in the prosecutor's closing argument. The error went to the "heart of the case," that is, the credibility of Camila. See Commonwealth v. Pearce, 427 Mass. 642, 645 (1998) (victim's credibility went to heart of case where Commonwealth's evidence "consisted primarily of the victim's testimony and four fresh complaint witnesses"). And the judge gave only the most general instructions to mitigate the mistake. In these circumstances, we

cannot say with assurance that this error could not have influenced the jury's verdict.[2]

The judge instructed the jury before closing arguments that a "closing statement is not itself evidence, nor is it a substitute for the evidence.  The evidence in this case is closed."  But we cannot be confident that the jury recognized that the prosecutor erred and that the mother never gave this testimony, where (1) the prosecutor quoted the mother's question to Camila about Camila's need to bathe in her opening statement on the first day of trial; (2) the prosecutor quoted the mother again about how "weird" it was that Camila wanted to take a bath after having just taken a bath earlier that morning in her

---

[2] In Commonwealth v. Silva-Santiago, 453 Mass. 782, 808 (2009), as here, "[t]he only instruction the judge gave that may have mitigated the error was her reminder to the jury in her final instructions that 'the closing arguments of the lawyers are not a substitute for the evidence.  They are only intended to assist you in understanding the evidence and the respective contentions of the parties.'"  We noted in that case, "The judge did not focus on any statement in the prosecutor's closing argument when she provided this guidance, so the jury were not warned to be careful in comparing their memory of [the witness's] testimony with the attorneys' characterization of it."  Id.

In Commonwealth v. Beaudry, 445 Mass. 577, 585 (2005), the judge told the jury in her final instructions not to speculate about matters not in evidence and to confine their deliberations to the evidence.  She also informed them that closing arguments are not evidence, and that the jury "should rely on their memory of the evidence if their memory [was] different from that of an attorney."  Id.  We characterized these remarks as "standard fare" and concluded that they did not address the closing argument error.  Id.

closing argument on the second day of trial; (3) neither the judge nor the prosecutor could recall whether the mother had given this testimony even after defense counsel told them it was never in evidence; (4) defense counsel did not have any opportunity to tell the jury that there was no such evidence because she had already given her closing argument; and (5) nothing the judge told the jury meaningfully cautioned them to be wary in considering the prosecutor's closing argument.  And if the jury were under the false impression that Camila's mother had testified that she thought it "weird" that Camila wanted to take a bath, we cannot say with assurance that this could not have influenced their verdict.  The prosecutor thought this supposed corroboration to be so important that she mentioned it both in her opening statement and in her closing argument, and discussed it first when she spoke about the corroboration of Camila's testimony.  And it would have been powerful corroboration of Camila's testimony, had it actually been in evidence, because it would have corroborated that Camila immediately after the incident said she felt "wet" and "sticky" after the defendant ejaculated on her.

In fact, apart from the first complaint evidence, which itself simply reported what Camila had said to her mother when she revealed the sexual abuse, the prosecutor's imagined testimony of the mother that Camila said she wanted to bathe or

shower and that the mother thought this "weird" because Camila had recently bathed, was the only significant corroboration of Camila's testimony. The other claimed corroboration that the prosecutor spoke of in her closing argument amounted to almost nothing.

The prosecutor argued three other sources of supposed corroboration. First, she argued that Camila's statement to her mother that she no longer wanted the defendant to pick her up from school was corroborative of her allegations of his sexual abuse. But the evidence at trial, offered by both Camila and her mother, was that the defendant worked as a taxicab driver during that time period and often would not drive Camila home from school until after he had finished his work day, which sometimes did not end until 10 P.M. Camila's testimony at trial was that she asked her mother to pick her up from school because "[the defendant] takes a long time to bring me back home."

Second, the prosecutor argued that it was corroborative that Camila wanted to come home from the defendant's home in the middle of the night on New Year's Eve. But the evidence at trial was that Camila's mother had rented a hall on New Year's Eve day to enable her entire family to get together, including the defendant, his sister, and his two nieces who were visiting from New York. Camila testified that the defendant wanted her to come to his home to spend time with his nieces, so she went

to his home with a friend and the friend's cousin at approximately 12:30 A.M.  As earlier noted, when she arrived, they were hungry, but the defendant said that he had no money and no food.  Camila said that she wanted to go home, and the defendant "screamed" at her, "Just go home, then, go home."  Camila told her mother that she wanted to come home and, after the defendant's niece took Camila to eat at a fast food restaurant, her cousin drove her home around 1:30 A.M.  There was no evidence that the defendant touched her that night, or attempted to.  Under these circumstances, it is hardly surprising or noteworthy that a nine year old child, especially one who testified that she gets homesick and prefers to stay at home with her mother, would want to go home.

Third, the prosecutor argued in closing, "You have [the defendant] himself telling you, 'She came to my house for sleepovers.  I picked her up at school.  We played all these games.'  That's all corroboration."  But all those facts are equally corroborative of a healthy relationship between a child and her godfather, whom she considers her uncle; accordingly, they lend no credence to Camila's testimony regarding sexual abuse.

We have found prejudicial error in comparable cases, despite the seriousness of the alleged crime.  In Commonwealth v. Loguidice, 420 Mass. 453, 453-454 (1995), the defendant was charged, and subsequently convicted of, two counts of forcible

rape of a four year old child. The prosecutor argued during closing that the child victim had observed the defendant masturbate and ejaculate, and that the persons who lived in the apartment near where the incidents allegedly occurred were at church on the morning of the day of the incidents; but there was no evidence in support of either assertion. Id. at 454-455. We noted that where "an objection is made to a prosecutor's error, the judge summarily rejects the challenge, and thus there is no curative jury instruction, an appellate court should proceed with caution in considering whether it is likely that an error made no difference in the jury's result." Id. at 456. In reversing the judgments, we concluded:

> "This was a close case for the jury. Success for the Commonwealth depended completely on the credibility of the child. In such an instance, errors in a prosecutor's closing argument describing a circumstance that made the defendant's commission of the crimes more plausible (the [neighbors'] absence) and putting the defendant in an unfavorable light (masturbation in front of the child) should not be viewed collectively as unlikely to have affected the jury's verdicts."

Id. at 457.

In Commonwealth v. Beaudry, 445 Mass. at 580, 586, we reversed the defendant's convictions of rape of a child where the prosecutor, despite the absence of expert testimony, declared during closing argument that a nine year old child would not have known about the specific types of sexual acts alleged unless she had experienced them. We determined that

where, despite a timely objection, the judge did not cure the improprieties "by appropriate and timely" instructions, and where "[t]he verdicts rested solely on the jury's believing [the alleged victim]" because "[t]here was no physical evidence or testimony from eyewitnesses to the abuse," id. at 585, "[w]e are unable to say that we are assured that the improper remark had little or no effect on the jury's deliberations." Id. at 586.

In Commonwealth v. Silva-Santiago, 453 Mass. at 806-807, the prosecutor argued in closing that an eyewitness had seen the defendant at the approximate location where the shooting occurred when, in fact, the eyewitness testified that she had seen the defendant there roughly ten to fifteen minutes before the shooting and had not seen him there at the time of the shooting. Where this witness's testimony was presented to corroborate the "photospread" identification of the defendant as the shooter by other eyewitnesses, and where the prosecutor, by mischaracterizing this part of her testimony, "transformed into inculpatory testimony the exculpatory part of [the witness's] testimony," we concluded that "[w]e cannot say with assurance that the closing argument errors, considered together in the totality of the circumstances, could not have influenced the jury to convict." Id. at 788, 808. See also Commonwealth v. Misquina, 82 Mass. App. Ct. 204, 205-208 (2012) (reversing indecent assault and battery conviction for prejudicial error

where prosecutor argued in closing that victim had recounted same description of crime to four persons, but where there was evidence of her telling only one person).

For the reasons stated, we conclude that, where the convictions in this case rested solely on the credibility of a young child, and where the prosecutor, in both her opening statement and closing argument, told the jury about key corroborative testimony of the mother that the prosecutor did not attempt to elicit during trial and that was not otherwise in evidence, and where a timely objection by defense counsel did not yield an effective curative instruction, we must reverse the convictions and remand the case for a new trial because we cannot say with assurance that the prosecutor's improper closing argument could not have influenced the jury to convict.[3,4]

---

[3] Because of the likelihood of a retrial, we address the defendant's two other claims of impropriety in the prosecutor's closing argument which, because they were not preserved at trial by an objection, we review to determine whether they created a substantial risk of a miscarriage of justice. See Commonwealth v. Horne, 476 Mass. 222, 225-226 (2017), quoting Commonwealth v. Zimmerman, 441 Mass. 146, 150 (2004) ("Where . . . the objection was not preserved, we review the defendant's claim to 'determine whether any error . . . created a substantial risk of a miscarriage of justice"). First, the defendant contends that the prosecutor in her closing argument, when speaking about Camila wanting to go home on New Year's Eve, improperly asked the rhetorical question, "Should we bring in more witnesses to tell you the same thing?" The defendant correctly contends that this statement improperly suggests that other witnesses would have corroborated Camila's testimony on this point had they testified. See Commonwealth v. Dirgo, 474 Mass. 1012, 1017 (2016) (improper for prosecutor to imply "that there were more

witnesses that were not brought before the jury that would have corroborated the first complaint testimony"). But where the defendant did not object to the prosecutor's use of this rhetorical question and where there was no testimony that the defendant sexually touched Camila on New Year's Eve, we conclude that this impropriety did not create a substantial risk of a miscarriage of justice.

Second, the defendant claims that the prosecutor improperly compared the evidence in this case to the evidence in other child sexual abuse cases when she stated during her closing argument, "In this case, as in a lot of these cases, the only evidence you have in front of you is testimony." But where the defendant did not object to the prosecutor's statement, we conclude that this comment regarding the nature of the evidence presented in "a lot of" other child sexual abuse cases, although best omitted, did not create a substantial risk of a miscarriage of justice.

[4] The dissent unfairly mischaracterizes the court's opinion in various ways that warrant rebuttal. First, the dissent attempts to paint the opinion as giving less weight to the credibility of the testimony of alleged victims of sexual assaults than the testimony of alleged victims of other crimes. It does not. If the allegation here was theft, rather than sexual assault, and if the weight of the evidence rested solely on the testimony of a child regarding events that happened when the child was between the ages of six and nine, our analysis would be precisely the same. We reject the notion that the testimony of alleged sexual assault victims is less credible than the testimony of the alleged victims of other crimes, and recognize that notion as the product of stereotypical misperceptions, prejudice, and bias. See generally Commonwealth v. Asenjo, 477 Mass. 599, 603 (2017), quoting Commonwealth v. King, 445 Mass. 217, 239-241 (2005), cert. denied, 546 U.S. 1216 (2006) ("the underlying purpose of first complaint evidence is still 'to counterbalance or address inaccurate assumptions regarding stereotypes about delayed reporting of a sexual assault or about sexual assault victims in general'"); Commonwealth v. Arana, 453 Mass. 214, 228 (2009) (recognizing importance "that a complainant (who, as here, may be still a child) has her credibility fairly judged on the specific facts of the case rather than unfairly by misguided stereotypical thinking").

Second, the dissent, in stating that "courts have dismissed the value of sexual assault victim testimony" with "ease," insinuates that the opinion here has done just that. Post at . It does not; we do not in any way dismiss the value of Camila's testimony. The testimony of Camila plainly was sufficient as a matter of law to support the defendant's convictions and, if the prosecutor had not told the jury in opening statement and closing argument of key corroborating testimony of Camila's mother that was not in evidence, the convictions would have been affirmed. But where a conviction rests solely on the credibility of a single witness, a reasonable jury must believe that witness's testimony beyond a reasonable doubt with respect to the required elements of a crime to find a defendant guilty of that crime. The issue on appeal is not whether we credit Camila's testimony, but whether we are "sure that the error did not influence the jury, or had but very slight effect" in the jury's evaluation of whether they believed that testimony beyond a reasonable doubt. See Commonwealth v. Hrabak, 440 Mass. 650, 656 (2004), quoting Commonwealth v. Flebotte, 417 Mass. 348, 353 (1994). By concluding that we are not sure that the error did not influence the jury in its deliberations, we in no way "dismiss" the value of Camila's testimony.

Third, the dissent contends that, by noting that Dr. Heather Forkey testified that Camila did not exhibit or report any of the common behavioral symptoms of abuse, including nightmares, bed-wetting, difficulty in school, and running away from home, and that her genital examination was "normal" for a nine year old girl, the court's opinion "creates a de facto corroboration requirement, necessitating a child without physical symptoms or eyewitnesses . . . to display enough emotional trauma to be credible." Post at . It does not. The uncorroborated testimony of a child is sufficient to support a conviction of sexual assault, but a competent prosecutor knows that the credibility of such testimony is stronger with corroboration than without it, and will offer corroborative evidence where it exists.

Finally, the dissent contends that, by vacating the conviction and remanding for a new trial, the court "does a disservice to all future victims whose interests are represented by imperfect prosecutors." Post at . The prosecutor here was not merely "imperfect" -- she twice told the jury that there was important corroboration from the mother that was not in evidence, and we are not sure that this error did not influence

2.  Expert testimony of treating physician.  The defendant invites us to hold that "[n]o individual should ever be permitted to testify in his or her capacity as both a treating doctor and an expert on the subject of child sexual abuse," because such testimony inevitably has the effect on a jury of improperly bolstering the victim's credibility.  He therefore claims that the judge committed reversible error by not striking Dr. Forkey's trial testimony that it is "very uncommon" to find physical injury on the genitals of victims of sexual abuse, and by admitting in evidence her opinion that "[t]he absence of physical trauma is not inconsistent with abuse."  Where this issue is likely to recur at a retrial of this case, we address the defendant's claim of error.  See Commonwealth v. Tanso, 411 Mass. 640, 651, cert. denied, 505 U.S. 1221 (1992).

Expert opinion testimony is appropriate and admissible where an expert's "specialized knowledge would be helpful to the jury."  Commonwealth v. Holley, 476 Mass. 114, 125 (2016), quoting Commonwealth v. Pytou Heang, 458 Mass. 827, 844 (2011).  See Mass. G. Evid. § 702(a) (2018).  "Under this principle, we have held that testimony on the general behavioral characteristics of sexually abused children may properly be the subject of expert testimony because behavioral and emotional

the jury in their deliberations.  It does not disserve future victims for this court to order a new trial where we find prejudicial error.  Due process requires nothing less.

characteristics common to these victims are 'beyond the jury's common knowledge and may aid them in reaching a decision." Commonwealth v. Federico, 425 Mass. 844, 847-848 (1997), quoting Commonwealth v. Colin C., 419 Mass. 54, 60 (1994). See, e.g., Commonwealth v. Day, 409 Mass. 719, 724 (1991) (expert testimony concerning "battered child syndrome" admissible because condition is not matter of common knowledge); Commonwealth v. Mamay, 407 Mass. 412, 421 (1990) (expert testimony regarding rape trauma syndrome admissible because syndrome is "beyond the jury's common knowledge").

Such expert testimony "must, however, be confined to a description of the general or typical characteristics shared by child victims of sexual abuse." Federico, 425 Mass. at 848. An expert witness on sexually abused children "may not 'directly opine on whether the victim was in fact subject to sexual abuse,' or directly refer or compare the behavior of the complainant to general behavioral characteristics of sexually abused children." Commonwealth v. Quinn, 469 Mass. 641, 647 (2014), quoting Federico, supra at 849. See Commonwealth v. Trowbridge, 419 Mass. 750, 759 (1995) ("[a]lthough expert testimony on the general behavioral characteristics of sexually abused children is permissible, an expert may not refer or compare the child to those general characteristics"). "Consequently, an expert may not opine that the child's behavior

or experience is consistent with the typical behavior or experience of sexually abused children." Quinn, supra. "Even where an expert does not directly compare the behavior of the complainant to that typical of sexually abused children, the expert's testimony may be inadmissible where a reasonable jury would think the expert was implicitly vouching for the credibility of the complainant." Id., and cases cited.

"The risk of improper comparisons between any general behavioral characteristics of sexually abused children and a particular complaining child witness is most acute when the expert witness has examined or treated the child. Testimony on the general characteristics of sexually abused children by such experts has been disallowed." Federico, supra, and cases cited. We have often warned of the danger of implicit vouching for the credibility of the complainant where a treating physician or psychologist in a child sexual abuse case testifies as an expert witness, see Quinn, 469 Mass. at 647-648, and cases cited, and at times have concluded that the implicit vouching arising from such testimony was prejudicial error. See id. at 650. See also Colin C., 419 Mass. at 60-61 (judge committed reversible error by allowing child's treating physician to give opinion testimony that child had been sexually abused); Commonwealth v. Brouillard, 40 Mass. App. Ct. 448, 451 (1996), overruled on another ground by Commonwealth v. King, 445 Mass. 217 (2005),

cert. denied, 546 U.S. 1216 (2006) (reversal required where child complainants' treating therapist "juxtaposed discussion of general syndromes with specific descriptions of and opinions about the complainants"). But we have not yet imposed the blanket prohibition proposed by the defendant that would bar a treating physician from offering any expert opinion in all child sexual abuse cases. We decline to do so here, given the nature of the opinion offered by the treating physician.

If, for example, Dr. Forkey had testified that, as a treating physician, she had observed Camila display various emotional, psychological, or behavioral characteristics, and then offered an expert opinion about the emotional, psychological, or behavioral characteristics of child victims of sexual abuse, we would likely conclude, given the acute risk of implicit vouching, that it was an abuse of discretion for a judge to have permitted such opinion testimony. See Quinn, 469 Mass. at 643, 644-646, 650 (expert opinion testimony was improper vouching for victim's credibility where licensed clinical social worker testified about victim's particular emotional problems and subsequently opined about similar or typical behavioral characteristics of child sexual abuse victims). And if, for example, Dr. Forkey had observed genital injuries during her examination of Camila, and then offered an expert opinion that Camila's genital injuries are consistent

with sexual abuse, we also would have likely concluded that the risk of implicit vouching was too great to permit the treating physician to offer such an opinion. See Trowbridge, 419 Mass. at 760 (treating physician's testimony came "impermissibly close" to endorsing child's credibility when she "testified that the symptoms and physical condition of the child were consistent with the type of nonviolent sexual abuse that the child alleged in this case"). But where, as here, the treating physician offered the expert opinion that it is "very uncommon" to find physical injury on the genitals of victims of sexual abuse and that "[t]he absence of physical trauma is not inconsistent with abuse," and where the prosecutor made clear in eliciting these opinions that her questions were not focused on the complainant, but were "general questions about a patient that would come in and see you, another child," we conclude that the risk of implicit vouching is so small that the judge did not abuse his discretion by not striking these opinions.[5]

We have recognized on prior occasions that a medical expert may be able to assist the jury by informing them that the absence of evidence of physical injury "does not necessarily

---

[5] We recognize that the judge did not strike Dr. Forkey's testimony that it is "very uncommon" to find physical injury on the genitals of victims of sexual abuse after sustaining an objection to this question only because he did not hear the answer. But, where the answer was not struck, we treat it as if the judge had denied the motion to strike after having heard the answer, and review for an abuse of discretion.

lead to the medical conclusion that the child was not abused," Federico, 425 Mass. at 851, because "[t]he jury may be under the mistaken understanding that certain types of sexual abuse always or nearly always causes physical injury or scarring in the victim." Id. at 851 n.13. Where such opinion testimony is admissible and where its probative value is to negate the inaccurate inference that a child who was sexually abused would have sustained some genital injury, we do not require the Commonwealth to call a nontreating physician expert to offer such an opinion. See Commonwealth v. Quincy Q., 434 Mass. 859, 871-872 (2001) (judge did not abuse discretion in admitting testimony of treating pediatrician that child's examination was "completely normal" and that "majority of girls examined for possible sexual abuse have 'normal' findings [i.e., no recognizable traces of physical contact]"). As in Quincy Q., Dr. Forkey's "testimony 'did no more than give the jury information concerning the medical interpretation of an absence of any physical evidence of penetration; namely, such a finding does not exclude that sexual abuse occurred.'" Id. at 872, quoting Commonwealth v. Colon, 49 Mass. App. Ct. 289, 293 (2000). Such testimony does not implicitly comment on the complainant's truthfulness; it says nothing more than that no inference can be drawn from the absence of genital injury.

Therefore, we conclude that the judge did not abuse his discretion in not striking Dr. Forkey's opinion testimony.

3.  Jury instructions.  A detective who investigated Camila's allegations against the defendant interviewed Camila, the defendant, Camila's mother, and Camila's sister, who was present when Camila first disclosed that she had been assaulted. The defendant contends that the detective's investigation was inadequate and, during his cross-examination of the detective at trial, he focused on the purported deficiencies in her investigation.[6]  The defendant contends that the judge unfairly limited the jury's consideration of his Bowden defense by instructing the jury to decide the case based solely on the evidence.  Because this issue may arise again at a retrial, we address it now.  See Tanso, 411 Mass. at 651.

We permit a defendant to elicit evidence of the purported inadequacy of the police investigation because "the inference that may be drawn from an inadequate police investigation is that the evidence at trial may be inadequate or unreliable because the police failed to conduct the scientific tests or to

_____

[6] During cross-examination, the defendant questioned the detective about the lapse in time between Camila's first complaint and her interviews of the defendant and Camila's mother.  The defendant also questioned her decision not to take a written statement from one of Camila's sisters, and not to speak with Camila's other sister.  The detective did not recognize the name of Camila's father or attempt to speak to her young cousins and friends who were present during some of the gatherings in question.

pursue leads that a reasonable police investigation would have conducted or investigated, and these tests or investigation reasonably may have led to significant evidence of the defendant's guilt or innocence."  Silva-Santiago, 453 Mass. at 801.  See Mass. G. Evid. § 1107(a) (2018) (evidence of inadequate police investigation may be admissible).  "A jury may find a reasonable doubt if they conclude that the investigation was careless, incomplete, or so focused on the defendant that it ignored leads that may have suggested other culprits."  Silva-Santiago, supra.  See Commonwealth v. Phinney, 446 Mass. 155, 165 (2006), S.C., 448 Mass. 621 (2007) ("Defendants have the right to base their defense on the failure of police adequately to investigate a murder in order to raise the issue of reasonable doubt as to the defendant's guilt"); Commonwealth v. Bowden, 379 Mass. at 486 ("[t]he fact that certain tests were not conducted or certain police procedures not followed could raise a reasonable doubt as to the defendant's guilt in the minds of the jurors").

We have long held that defense counsel in closing argument is entitled to argue that the jury should find the defendant not guilty because of the inadequacy of a police investigation.  See, e.g., Commonwealth v. Fitzpatrick, 463 Mass. 581, 597-598 (2012).  Here, in closing argument, defense counsel

characterized the police investigation as "offensive" and asked two rhetorical questions:

> "A person is charged with one of the most horrible things you can possibly be accused of, and no one in the family is interviewed, spoken to?  If we're supposed to trust the police to get to the bottom of something and to be just as concerned with confirming that nothing happened, and maybe clearing someone, wouldn't you hope they would speak to a couple [of] witnesses?"

The judge declined the defendant's request for a Bowden instruction.  The defendant does not challenge the judge's declination, recognizing that it is within the discretion of the judge whether to provide the jury with a Bowden instruction that explains to the jury the inferences they may draw if they were to find the investigation inadequate.  See, e.g., Commonwealth v. Durand, 475 Mass. 657, 674 (2016), cert. denied, 138 S. Ct. 259 (2017), quoting Commonwealth v. Lao, 460 Mass. 12, 23 (2011) ("a judge is not required to instruct on the claimed inadequacy of a police investigation.  'Bowden simply holds that a judge may not remove the issue from the jury's consideration'"); Commonwealth v. Williams, 439 Mass. 678, 687 (2003) (declining to give Bowden instruction not error "because the giving of such an instruction is never required").  See also Mass. G. Evid. § 1107(b) (2018) (giving of Bowden instruction is discretionary).

Instead, the defendant claims that the judge erred in giving the jury the following facially proper instruction

because, in the context of the evidence in this case, the instruction unfairly limited the jury's full consideration of the Bowden evidence and, effectively, negated the defendant's Bowden argument:

> "You are not to decide this case based on what you may have read or heard outside of this courtroom. You are not to engage in any guesswork about any unanswered questions that remain in your mind. You should not consider anything I have said or done during the trial, in ruling on objections, or in comments to the attorneys, or in questions to witnesses, or in setting forth the law in these instructions, as any indication of my opinion as to how you should decide the case. In short, you are to confine your deliberations to the evidence and nothing but the evidence."

> "You are to decide what the facts are solely from the evidence admitted in this case, and not from suspicion or conjecture. The evidence consists of the testimony of witnesses as you recall it, any documents or other things that were received into evidence as exhibits. You will have all of the exhibits with you in the jury room. You alone will decide the weight -- that is, the value -- that they deserve to receive in helping you make your ultimate judgment about whether the Commonwealth has proved its case" (emphases added by defendant).

We recognize that, in some circumstances, a facially proper jury instruction that the jury should decide the case based on the evidence rather than guesswork or conjecture may reasonably be understood by the jury to negate or undercut a defendant's proper Bowden argument, such as where the judge interrupts defense counsel's Bowden argument to give the instruction, or where the judge furnishes this instruction in response to a question from the jury about a Bowden issue. See, e.g.,

Commonwealth v. Gilmore, 399 Mass. 741, 746 (1987) ("The judge twice interrupted defense counsel's closing argument to instruct the jury that they were to consider only 'the evidence introduced in fact in this case.' Not only did the judge prevent defense counsel from pursuing a permissible line of argument, but he . . . in effect instructed the jury to disregard defense counsel's immediately preceding argument"); Commonwealth v. Remedor, 52 Mass. App. Ct. 694, 700 (2001) ("[t]he judge's response to the jury's question, refusing to answer the question concerning admissibility and instructing the jury to confine their consideration to the evidence that was presented, in context could only have been understood by the jury as a ruling that the police officers' failure to record the transaction or to photograph the taxicab driver or to record his license and taxicab numbers, were not an appropriate ground upon which to build a defense and were not to be considered by them."

Here, however, defense counsel proceeded through her closing argument uninterrupted, and the judge's instructions were not issued in response to any specific questions from the jury. Rather, this instruction constituted a small part of the judge's final jury instructions that were given after the attorneys had presented their respective closing arguments. In light of the context in which these instructions were given, there is nothing to suggest that these instructions "may have

been construed by the jury as requiring them to reject the [Bowden defense] suggested by defense counsel." Commonwealth v. Smith, 49 Mass. App. Ct. 827, 832 (2000). Where a judge, in his or her final jury instructions, tells the jury to decide the case based solely on the evidence rather than on guesswork or conjecture, it is unlikely that the jury will hear that instruction as a derogatory comment on the defendant's Bowden argument. Moreover, the permissible inference from "police failure to take certain investigatory steps, as it relates to the reliability of the Commonwealth's case," rests on evidence actually presented regarding the inadequacy of the police investigation, and "is not intended to permit jurors to speculate about the results of investigative steps not taken." Commonwealth v. Tolan, 453 Mass. 634, 652 (2009). On retrial, however, if the judge decides not to give a Bowden instruction as part of the final jury instructions, it would be prudent to omit from the instructions the sentence, "You are not to engage in any guesswork about any unanswered questions that remain in your mind," to avoid the risk that the jury may interpret this sentence as undercutting the defendant's Bowden argument.

Conclusion. For the reasons stated above, we vacate the defendant's convictions and remand the case to the Superior Court for a new trial.

So ordered.

LOWY, J. (concurring, with whom Lenk and Budd, JJ., join). I agree with the court that the prosecutor's closing argument constituted prejudicial error, requiring reversal of the defendant's conviction. I do so not because this is a sexual assault case, nor because the conviction rests on the testimony of a young child. I do so because jurors crave corroboration, and the prosecutor's closing argument included powerful statements corroborating the child's testimony that were not offered in evidence at trial. Specifically, the prosecutor inaccurately argued that the victim's mother had testified that, upon returning from spending time with the defendant, the victim told her mother that she felt "disgusting" and wanted to take a bath. Although it appears that the mother would have so testified had she been asked, the prosecutor did not elicit this testimony on direct examination. I cannot say with assurance that this remark in the prosecutor's closing, referencing a statement not admitted in evidence, could not have influenced the jury's verdict.

I write separately because I agree with many of the concerns raised by Justice Cypher in her dissent. I believe that, unfortunately, little has changed since we noted in Commonwealth v. King, 445 Mass 217, 238-239 (2005), cert. denied, 546 U.S. 1216 (2006) that:

"Some jurors may continue to harbor prejudicial misperceptions about the nature of rape and rape allegations, including that complainants who wear revealing clothing, consume drugs or alcohol, or have unorthodox or promiscuous lifestyles cannot be 'real' victims of rape; that forced sex by a spouse or a past partner does not constitute 'real' rape; and that false accusations of sexual assault are more frequent than those of other violent crimes."

The dissent's clarion call cautioning trial and appellate courts to evaluate the testimony of sexual assault victims no more critically than victims or witnesses of other crimes is well taken.  The mistreatment of victims of sexual assault is still present in many aspects of our society today.  It is imperative that nothing in our decision today be interpreted as endorsing antiquated notions of what makes an alleged victim of rape credible.

Our society's normative values concerning sexual relationships have evolved and are varied and complex.  All too often, victims of sexual assault are forced to endure further trauma in their pursuit of justice.  This trauma goes beyond having to testify about the crime committed.  A victim of sexual assault is often scrutinized in a manner that is far more pervasive than victims of almost any other crime.  For the victim of a robbery, their privileged medical or psychiatric records are not usually subject to scrutiny; their previous personal relationships, conduct, and the most intimate details of their life are not often topics of cross-examination.

However, this is the reality for many victims of sexual assault; they are treated with more distrust than victims of other crimes.  The dissent's emphasis on some of the troubling aspects of sexual assault prosecutions -- a lingering and unacceptable vestige of our society's history of gender inequality -- raises concerns that we must not ignore and that should be kept firmly in mind.

CYPHER, J. (dissenting, with whom Kafker, J., joins).  This case involves a prosecutorial error, preserved by objection, and calls upon the court to determine that error's impact.  When assessing such an error's effect, the court frequently evaluates the strength of the Commonwealth's case, absent the error, to determine whether "the error did not influence the jury, or had but very slight effect."  Commonwealth v. Hrabak, 440 Mass. 650, 656 (2004), quoting Commonwealth v. Flebotte, 417 Mass. 348, 353 (1994).  In cases such as this, where the victim of the alleged crime testifies, the court naturally evaluates her testimony when considering whether the Commonwealth's case was independently strong enough without the prosecutor's mistake.  I disagree with the court about the importance of the undisputed, consistent, and clear testimony of a survivor of sexual assault and would conclude that a prosecutorial error, even if preserved, does not necessarily erase the merits of a strong case.  Because a long line of cases arguably evaluates the testimony of survivors of sexual assault more critically than testimony of victims and witnesses of other kinds of crimes, which does a disservice to all future victims whose interests are represented by imperfect prosecutors,[1] I dissent.

---

[1] The court disputes this characterization of the prosecutor's performance, alleging that "she twice told the jury that there was important corroboration from the mother that was not in evidence."  Ante at note 4.  A close reading of the

Perhaps the ease with which courts have dismissed the value of sexual assault victim testimony has its roots in Sir Matthew Hale's Seventeenth Century adage, describing rape as "an accusation easily to be made and hard to be proved, and harder to be defended by the party accused, tho ever so innocent."  See Anderson, The Legacy of the Prompt Complaint Requirement, Corroboration Requirement, and Cautionary Instructions on Campus Sexual Assault, 84 B.U. L. Rev. 945, 948 (2004).  See id. at 949 ("Many jurisdictions responded to Hale's admonition by requiring courts to issue instructions cautioning juries to regard the complainant's testimony in rape cases with particular suspicion").  Hale's admonishment accompanied the "hue and cry" requirement, mandating that courts credit a victim's complaint only if made immediately following an assault.  Torrey, When Will We Be Believed?  Rape Myths and the Idea of a Fair Trial in Rape Prosecutions, 24 U.C. Davis L. Rev. 1013, 1041 (1991).  Hale's words of caution about the testimony of rape complainants were imported into the American legal system.  Anderson, supra at 960.  Every American jurisdiction previously required

---

record shows that the prosecutor's error occurred only once, during the disputed closing argument.  The court mischaracterizes the prosecutor's opening statement.  There, the prosecutor mentioned Camila's desire to take a bath after the first assault, during a section in which she previewed Camila's testimony, not any evidence to be offered by Camila's mother. Camila testified in accordance with the prosecutor's opening statement.

evidence that the victim promptly reported the assault before permitting a prosecution to proceed or upholding a conviction. DuBois, A Matter of Time:  Evidence of a Victim's Prompt Complaint in New York, 53 Brook. L. Rev. 1087 n.2 (1988).  See Commonwealth v. Izzo, 359 Mass. 39, 44 (1971) , quoting Glover v. Callahan, 299 Mass. 55, 57 (1937) (Commonwealth has "duty" to demonstrate victim expeditiously reported sexual assault because "where a female witness testifies as to a rape or similar assault upon her the mere absence of evidence of an earlier complaint discredits her.  A legitimate argument against her credibility may be made solely on the basis of the absence of evidence of such a complaint").

Massachusetts has since departed from some of those troubling requirements of sexual assault prosecutions, see Commonwealth v. King, 445 Mass. 217, 242 (2005), cert. denied, 546 U.S. 1216 (2006),[2] but remnants of these philosophies clearly survive.  When evaluating the Commonwealth's evidence in the face of an error in cases without sexual assault charges, our jurisprudence frequently credits testimony of witnesses and victims.  See Commonwealth v. Stevens, 379 Mass. 772, 774 (1980) (case against defendant for armed assault with intent to murder

---

[2] We preserve the opportunity for the Commonwealth to introduce first complaint evidence "consistent with our focus on the evidence pertaining to the facts and circumstances surrounding the complainant's initial report of the alleged crime."  King, 445 Mass. at 242.

and armed robbery, based on testimony of victim, was "strong");
Commonwealth v. Walker, 421 Mass. 90, 98-99 (1995) (affirming
robbery conviction despite multiple improper comments by judge
and prosecutor because Commonwealth made "strong" case where
only evidence was victim's testimony). See also Commonwealth v.
Barbosa, 463 Mass. 116, 118 (2012) (based in eyewitness
testimony, case against defendant for murder in first degree and
multiple firearms offenses was strong, despite all identifying
witnesses being impeached with prior inconsistent statements and
judge erroneously admitting hearsay to corroborate testimony of
Commonwealth's witness); Commonwealth v. Rollins, 441 Mass. 114,
118-119 (2004) (case against defendant for operating motor
vehicle while intoxicated, where Commonwealth introduced only
testimony of police officer witnesses, was strong). Yet when
performing the same analysis in cases of sexual assault, the
testimony of victims appears to be given comparably less weight.
See Commonwealth v. Beaudry, 445 Mass. 577, 585 (2005) (closing
argument error in child rape case was prejudicial where victim
was only witness to abuse); Hrabak, 440 Mass. at 656
(Commonwealth's case was not strong enough to withstand error
where six year old anal rape victim's testimony was only
evidence); Commonwealth v. Scheffer, 43 Mass. App. Ct. 398, 401
(1997) (reversing conviction for rape of child where error
"might loom less large in a case where there was anatomical or

percipient witness evidence [from other than the purported victim] that made the government case of sexual abuse overwhelming"); Commonwealth v. LaCaprucia, 41 Mass. App. Ct. 496, 502 (1996), S.C., 429 Mass. 440 (1999) (case against defendant in child sexual assault case was not strong where there was limited physical evidence, so victims' statements were central to Commonwealth's case). Cf. Commonwealth v. White, 475 Mass. 724, 740 (2016) (recognizing that corroboration requirement in G. L. c. 277, § 63, "sets a high bar for prosecuting sexual offenses against children that are alleged to have occurred many years before"). See Raitt, Judging Children's Credibility -- Cracks in the Culture of Disbelief, or Business as Usual?, 13 New. Crim. L. Rev. 735, 737 (2010) ("Concern over children's reliability as witnesses dates back centuries, and this concern is compounded when the child is a complainant of a sexual offense"). The court's conclusion is tinged with this legacy.

I would eschew the entrenched habits of excess suspicion of rape victims and affirm this conviction.[3] When properly evaluating the value of the victim's testimony, it is clear the error was not prejudicial. "[T]he prosecutor's improper statement warrants reversal only if it prejudiced the defendant

---

[3] Of course, we do not presume a person is guilty based on a mere untested accusation.

in light of the prosecutor's entire argument, the trial testimony, and the judge's instructions to the jury." Commonwealth v. Burgos, 462 Mass. 53, 72, cert. denied, 568 U.S. 1072 (2012). Within that context, we also consider "the persistence or flagrancy of the remarks." Commonwealth v. Clary, 388 Mass. 583, 590-591 (1983), quoting Commonwealth v. Dougan, 377 Mass. 303, 312 (1979). Approximately seven transcribed pages into closing argument, the Commonwealth sought to remind the jury of testimony of some sources of corroboration of the details surrounding the allegations of assault. At that time, the prosecutor told the jury that Camila's mother had remembered Camila coming home from being out with the defendant and wanting to take a bath. Although Camila had testified to this, the prosecutor had failed to elicit this testimony from Camila's mother.

This error, properly considered in its context, "did not influence the jury, or had but very slight effect." Hrabak, 440 Mass. at 656, quoting Flebotte, 417 Mass. at 353. This error was far from the persistent or flagrant comments that necessitate upending a jury verdict. Camila's testimony was strong evidence against the defendant and should be treated as such. She described, in detail, each incident of abuse.[4] Her

---

[4] The defendant's cross-examination focused on the happy relationship Camila had with her family, including the

testimony alone was enough evidence to merit a conviction.  The
jury listened to all of her testimony, just as they listened to
the judge's repeated and clear instructions about argument not
being evidence.[5]  "[W]e must and do recognize that closing

_____

defendant, and Camila's parents' gentle style of discipline.
Defense counsel contended in closing argument that if the
defendant were abusing Camila, her family would have noticed,
and she would have felt safe coming forward because her parents
did not hit her or often shout at her.  Although Camila did not
disclose immediately, she did, in fact, disclose the abuse to
her family.

[5] During jury empanelment, the judge told the jury that they
would be deciding the case solely on the evidence and that
evidence consisted of witness testimony, exhibits, and factual
stipulations alone.  After jury empanelment, the judge reminded
the jury that they would decide the case "exclusively on the
evidence."  At the beginning of trial, the judge told the jury
that statements from the attorneys are not evidence.  Prior to
closing argument the judge instructed the jury that a "closing
statement is not itself evidence, nor is it a substitute for the
evidence.  The evidence in this case is closed."

After closing argument, the defendant requested that the
judge immediately remind the jurors that their memory of the
evidence controls.  The judge declined because that instruction
was "adequately covered in the [jury] charge as a whole."  The
judge then immediately instructed the jury, beginning the charge
by reminding the jury that they are "the sole and exclusive
judges of the facts."  While elaborating on how the jury may
find facts, the judge reminded the jury that "opening statements
and the closing arguments of the lawyers are not a substitute
for the evidence."

Although the judge issued that instruction further from the
prosecutor's closing argument than the defendant wished
(approximately five transcribed pages separate the defendant's
request and the judge's reminder that closing arguments are not
evidence), its content satisfied the defendant's request.  "In
light of the judge's repeated instructions that the closing
arguments do not constitute evidence, any damage to the
defendant was sufficiently repaired."  Commonwealth v.

argument is identified as argument, the jury understand[] that, instructions from the judge inform the jury that closing argument is not evidence, and instructions may mitigate any prejudice in the final argument." Commonwealth v. Kozec, 399 Mass. 514, 517 (1987). See Commonwealth v. Hammond, 477 Mass. 499, 507-508 (2017) (affirming convictions of raping three children, despite prosecutor's two improper statements in closing argument, where judge gave curative instructions when charging jury).

Moreover, the prosecutor's erroneous statement was an insignificant portion of her closing argument, occupying a mere five lines out of approximately nine transcribed pages. Compare Clary, 388 Mass. at 593 (reversing where "a fact not proved directly or by fair inference . . . was used as a focal point in the prosecutor's argument"), with Commonwealth v. Wood, 469 Mass. 266, 286 (2014) ("[W]e cannot say that the error, taken in context, made a difference in the jury's conclusion. It was a single statement made in the course of a lengthy closing argument"). The prosecutor discussed other evidence from Camila's mother's testimony corroborating that the defendant

O'Connell, 432 Mass. 657, 659 n.3 (2000). See Commonwealth v. Dagley, 442 Mass. 713, 725 (2004), cert. denied, 544 U.S. 930 (2005) ("That the judge's final instruction did not include any express correction of the prosecutor's mischaracterization does not mean that the instruction was inadequate to cure any confusion caused by that mischaracterization").

would pick up Camila from school, but that she wanted that to stop, and that she came home in the middle of the night on New Year's Eve.[6]  The prosecutor also reminded the jury that the defendant himself told police that Camila would sleep at his house and he would pick her up from school, further verifying the contextual details of Camila's testimony.  Compare Commonwealth v. Gomes, 443 Mass. 502, 510 (2005) ("improper subject of argument" was "isolated" "slip of the tongue" and did not require reversal), with Beaudry, 445 Mass. at 585-586 (prosecutor's comment that child victim was credible because her sexual knowledge was inappropriate for her age and must have been result of defendant's abuse was unsupported by record and could have influenced jury's decision about all allegations). The court's focus on Camila not displaying the behavioral characteristics of a "normal" child who has suffered abuse creates a de facto corroboration requirement, necessitating a

---

[6] The court dismisses the value of the testimony corroborating the context of Camila's allegations because such behavior is "hardly surprising or noteworthy" for a child of Camila's age. Ante at   . Considered in isolation, any fact about a child's behavior can seem insufficient to support allegations of abuse, especially where such evaluations include the court taking judicial notice of what is normal for a child of a certain age. Even the recognized signs of abuse, which the court notes are absent, such as nightmares, bed-wetting, difficulty in school, or running away from home, can be interpreted in isolation to have innocent explanations. Ante at  . When considered in the full context of allegations of sexual abuse, however, behavior that can be otherwise typical for some children can inform our understanding of a particular child victim's testimony.

child without physical symptoms or eyewitnesses (as already discussed, each is uncommon in child sexual assault cases) to display enough emotional trauma to be credible.  Beyond the obvious issues with demanding a certain type of behavior from victims of these crimes, this requires a child to walk a tightrope of being behaviorally symptomatic enough to be believed, but not too emotional so as to be deemed unreliable. See Commonwealth v. Quinn, 469 Mass. 641, 650 (2014) (vacating child rape conviction where "Commonwealth's case rested almost entirely on the credibility of the emotionally troubled victim").  See also Raitt, supra at 737 ("The concerns affecting children that cloud [child rape cases] and evidence are very similar to the suspicion expressed toward all victims of sexual assault, which is made explicit through expectations that the 'righteous' victim will be of impeccable character, make the complaint promptly, exhibit tangible injuries, and provide a full and unswerving account").  Even if the court's devaluation of other sources of corroboration is accurate, this nonetheless does nothing to minimize the strength of Camila's testimony as the core of the Commonwealth's case.  The Commonwealth presented a case that was sturdy without the addition of the prosecutor's inaccurate closing argument.

This case hews closely to a common pattern of child sexual assault cases, where the assailant preys on the child in

secluded, controlled environments, leaving no other eyewitnesses to the actual acts of abuse.  See Buller, Fighting Rape Culture with Noncorroboration Instructions, 53 Tulsa L. Rev. 1, 5 (2017) (large majority of sexual assault cases have no third-party eyewitnesses); Walsh, Jones, Cross, & Lippert, Prosecuting Child Sexual Abuse:  The Importance of Evidence Type, 56 Crime & Delinquency 436, 438 (2010) ("[c]hild sexual abuse is distinct from other types of crimes because multiple forms of convincing evidence are often lacking").  See also Beaudry, 445 Mass. at 585 (noting, in case without physical evidence or eyewitnesses, "[a]s is often true in cases involving sexual abuse, the trial was a battle of the credibility of the witnesses").  Where no physical evidence is available,[7] it is the victim's testimony alone that stands as direct evidence of the assault.[8]  Camila's

---

[7] See T.J. Buller, Fighting Rape Culture with Noncorroboration Instructions, 53 Tulsa L. Rev. 1, 5-6 (2017) (evidence of physical injury from sexual assault is uncommon and "the odds of finding any physical trauma decreases dramatically following the first twenty-four hours after an attack").

[8] The persistent lack of physical evidence and regular disbelief of victims necessitates that prior bad acts be admissible in cases of rape and sexual assault.  See Fed. R. Evid. 413 & 414; Larsen, Sexual Violence is Unique:  Why Evidence of Other Crimes Should be Admissible in Sexual Assault and Child Molestation Cases, 29 Hamline L. Rev. 177, 207-208 (2006) ("perceived lack of credibility demands a rule that attempts to equalize the rights of the victim with the rights of the accused.  The credibility problem becomes particularly important given that many victims will refrain from reporting the crime since they are perceived as unbelievable").  Such a change would be an important, but not radical, change in our

testimony, as the only percipient witness to these crimes, deserves no less value than the testimony of any other victim in a case not involving sexual assault.

Given the entirety of the evidence and the minor role the prosecutor's misstatement played in closing argument, I conclude that the error could not have influenced the jury's decision.  I dissent.

---

current case law.  See e.g., Commonwealth v. Helfant, 398 Mass. 214, 225-226 (1986) (affirming rape conviction where two people testified that defendant sexually assaulted them in circumstances similar to victim's allegations because prior acts were probative of defendant's common pattern of conduct and probative value outweighed prejudice to defendant); Commonwealth v. King, 387 Mass. 464, 469, 470 (1982) (affirming conviction of rape of child where Commonwealth introduced evidence of defendant's uncharged rape of child other than victim because evidence showed common pattern or course of conduct toward two children and was "sufficiently related in time and location to be logically probative"); Commonwealth v. Lanning, 32 Mass. App. Ct. 279, 283 (1992) (affirming convictions of indecent assault and battery on child and rape of child where children other than victims testified about defendant's prior acts, because "the evidence corroborated the victims' testimony and showed a common scheme and pattern of behavior").